SCAMPMORTE v. SCAMPMORTE, ADMINISTRATOR, ET AL.

[No. 19,265.  Filed January 5, 1962.  Rehearing denied February 20, 1962.  Transfer denied April 18, 1962.]

278

*Joan C. Bashaw,* and *Robert L. Shearer,* both of Anderson, for appellant.

*Conrad S. Arnkens, Samuel E. Johnson, Vincent Kelley, Kelley, Arnold & Kelley, Johnson & Austin*

and *John D. Staggenburg*, all of Anderson, for appellee.

BIERLY, J.—This action was brought by appellant in the Madison Superior Court on petition to probate the lost will of one Frank Scampmorte, who died a resident of Madison County, Indiana, on the 18th day of April, 1957, leaving an estate of both real and personal property.

Appellees-defendants below put the cause at issue by filing objections to probate of said lost will, and affirmatively charging unsoundness of mind of decedent at the time of the alleged execution of said will, and that at said time decedent lacked testamentary capacity.

Trial was had by the court without the intervention of a jury.

At the trial the appellant, "Little" Frank Scampmorte, introduced his evidence and rested; the appellees presented no evidence. Following final arguments, appellees moved for a directed verdict which was overruled.

The court found against appellant, and rendered consistent judgment thereon and that the decedent died intestate.

A motion for a new trial was timely filed by appellant asserting that the finding of the court is contrary to law, and error by the court in refusing to permit the witness, Helen Mable Moss, to answer certain questions, citing questions, the objections thereto, if any, the ruling on objections, if any, and the answers to the questions. The motion for a new trial was overruled and this appeal followed.

Appellant in his assignment of errors, charged (1) "The Court erred in overruling appellant's motion for a new trial." (2) "The Court committed error of law

at the trial of said cause in excluding certain testimony of the witness, Helen Mabel Moss."

The record discloses that the decedent was a resident of Madison County, Indiana, but while on vacation in the state of Florida, on November 14, 1953, he suffered a heart attack necessitating hospitalization.

Garnet Stottlemyer, a friend of fifteen years standing, and accompanied by a doctor, took Scampmorte by ambulance to the Sarasota Memorial Hospital in the late afternoon of the same day. Testimony was further to the effect that Scampmorte, alarmed by his illness, told Stottlemyer, "I might not make it through the night," and after indicating to Stottlemyer the disposition of his estate, he requested Stottlemyer to prepare the will. After preparing the will, Stottlemyer and Scampmorte both signed the instrument in the decedent's room. Stottlemyer afterward proceeded to get two nurses to come to Scampmorte's room who also signed the instrument.

Testimony further is to the effect that said instrument was placed with Mr. Stottlemyer, who retained possession thereof in his Florida home, but, who, having inquired in Indiana of Mr. Scampmorte about the "paper," and being told to destroy it as ". . . other arrangements had been made," upon returning to Florida, later ran across the "paper," and, recalling Mr. Scampmorte's request, sometime in September, 1954, put the reputed will in a waste basket. As heretofore stated, Frank Scampmorte died April 18, 1957.

The alleged lost will as set forth in Appellant's brief follows:

"WILL"

"I give to my nephew, Frank, The Snack, The Toast, The Pearl Street Property and the money in both Loan Associations.

"I give all the rest of my property to my heirs.
Adelaide Hoostal /s/     Frank Scampmorte /s/
Helen Mable Moss /s/     Garnet Stottlemyer /s/"

The testimony of Stottlemyer, the scrivener, and witness to the will, testified that according to the executed will, decedent's property at 13th and Main, the property on Pendleton Avenue, the Pearl Street Property, and the money in the two banks were to go to Frank Scampmorte, the nephew and appellant; that the balance of decedent's estate was to go to the remaining heirs, appellees herein.

Failure of appellees to introduce any evidence, we need to give no consideration to their objections to probate of said will.

It appears to us that Point No. (2) in appellant's assignment of errors is mere surplusage since this matter is adequately covered in appellant's motion for a new trial.

We have presented to us for consideration the problem, the distillation of which, is whether the purported lost will of the decedent was legally executed.

It has been stated that:

". . . Strictly speaking, there is no such thing as a substantially correctly executed will. Either the will meets the legislative requirements or it is void." 2 Henry's Probate, Sixth Edition, §3, p. 976. (Our emphasis.)

At the time of the execution of the alleged will of the decedent, the Probate Code provided:

"§7-201. . . . No will, except a nuncupative will, shall affect any estate unless it shall be in writing, signed by the testator, or by someone in his presence with his consent, and attested and subscribed in his presence by two (2) or more competent witnesses; and if the witnesses are competent at the time of attesting, their subsequent

incompetency shall not prevent the probate thereof." Burns' Ind. Stat., Annotated, 1933. [2 R. S. 1852, ch. 11, §18, p. 308.]

The present statute relative to the execution reads as follows:

"§6-503. . . . The execution of a will, other than a nuncupative will, must be by the signature of the testator and of at least two [2] witnesses as follows:

(a) The testator shall signify to the attesting witnesses that the instrument is his will and either

(1) Himself sign, or

(2) Acknowledge his signature already made, or

(3) At his direction and in his presence have someone else sign his name for him, and

(4) In any of the above cases the act must be done in the presence of two [2] or more attesting witnesses.

(b) The attesting witnesses must sign

(1) In the presence of the testator, and

(2) In the presence of each other." [Acts 1953, ch. 112, §503, p. 295.]

Section 6-505, Burns' Ind. Stat., 1953 Replacement, states the manner of legal execution of a will in accordance with the present code, to-wit:

"A will is legally executed if the manner of its execution complies with the law, in force either at the time of execution or at the time of the testator's death, of

(1) This state, or

(2) The place of execution, or

(3) The domicile of the testator at the time of execution or at the time of his death."

The determinable factor involved in the appeal revolves about the legal execution of the alleged lost

will of Frank Scampmorte. It either was or was not legally executed. Resolving this point is the crux of this appeal. If it appears that the lost will failed by due execution, a consideration of other matters would be pointless.

The Probate Code of 1953 went into effect January 1, 1954, following the execution of the alleged will on the 14th day of November, 1953. Thus to determine the question of legal execution of said alleged will, consideration must be given to the statutes prior and subsequent to the effective date of the new Probate Code.

In compliance with §6-505, Burns' Ind. Stat., 1953 Replacement, *supra,* of the present Probate Code of 1953, the execution of the purported will needs only to conform to the law in existence at either the date of the execution of said will or at the date of testator's death. If the purported will was not executed in accordance with the statutory requirements in effect on one of those two dates, then the will is void. *Fletcher Trust Co.* v. *Morse* (1951), 230 Ind. 44, 101 N. E. 2d 658; *Orth et al.* v. *Orth et al.* (1895), 145 Ind. 184, 42 N. E. 277.

It is well settled, that in accordance with the Probate Code of 1953, and the law prior thereto, the execution of the will must be by the signature of the testator (or having another sign his name at testator's request), and of at least two (2) subcribing witnesses. §6-503 Burns' Ind. Stat., 1953 Replacement and 29 I. L. E. Wills, §71, p. 226 and cited cases.

According to the evidence, three persons allegedly were witnesses to the will of the decedent. Two witnesses, who have complied with the requirement of the statute are sufficient to show legal execution thereof.

Under the Probate Code of 1953, it is necessary that the testator signify that the instrument, which the witnesses are about to sign, is his will. §6-503, Burns' Ind. Stat., 1953 Replacement, *supra*. The law prior to the effective date of the 1953 code did not require that the witnesses knew that the instrument to which they affixed their signatures was the will of the testator. *Herring* v. *Watson* (1914), 182 Ind. 374, 105 N. E. 900; *Turner and Others* v. *Cook* (1871), 36 Ind. 129; *Brown and Others* v. *Mc-Alister and Others* (1870), 34 Ind. 375. Under the present code it seems that the testator must sign prior to witnesses but under the old code, it was held by this Court that the order of affixing signatures by the testator and witnesses was immaterial, ". . . where the signing by the testator and the witnesses was one continuous transaction and all the signatures were in the presence of each other the will is properly executed in that respect, in the absence of a statutory requirement to the contrary." *Harmening* v. *Harmening* (1926), 84 Ind. App. 459, 150 N. E. 376.

It may be repetitious to state that under the present code the witnesses must attest the will in the presence of the testator and in the presence of one another. But under the prior law it has been held that it was not necessary that the subscribing witnesses sign at the same time and in the presence of each other. *Johnson et al.* v. *Johnson* (1886), 106 Ind. 475, 7 N. E. 201.

It has also been held prior to the present code that the attestation by the witnesses must be at the request of the testator, *Bundy* v. *McKnight, Ex'r, et al.* (1874), 48 Ind. 502, though it is not necessary to show a formal request, *Herbert* v. *Berrier et al.* (1881), 81 Ind. 1, or that the request came from

the testator himself. *Dyer et al.* v. *Dyer et al.* (1882), 87 Ind. 13; *Bundy* v. *McKnight, Ex'r, et al., supra.*

Where a person expresses a wish to make a will, directs it to be prepared, and, this having been done, signs it, a request by the attorney who prepared it and made in the hearing of the testator that persons should witness it, is the request of the testator. *Conway* v. *Vizzard et al.* (1890), 122 Ind. 266, 23 N. E. 771.

Generally speaking under both the old and the new code, it is necessary that the witnesses to a will know that the signature to which they are attesting is the signature of the testator, and that the testator intended it as such. *Herring* v. *Watson, supra; Turner and Others* v. *Cook* (1871), 36 Ind. 129; *Reed and Another* v. *Watson and Another* (1867), 27 Ind. 443; §6-503, Burns' Ind. Stat., 1953 Replacement, *supra.*

The law is clear that when acknowledging testator's signature, witnesses need not actually see the testator sign his name, if he in some manner, either by his action or by his spoken words has clearly indicated that the signature is his own.

In an examination of the evidence in the case at bar, it appears that this was not done. The record indicates to this court that only one witness complied with the requirements heretofore stated. The evidence discloses that only Garnet Stottlemyer, a witness, was present when the testator affixed his signature to the purported will.

As has been previously stated, the attesting witnesses need not.

". . . see the testator sign the will, or that they should see his signature after he has signed, *it being sufficient that the testator, in some*

*manner, makes known to them the fact that he has signed it." Wersich* v. *Phelps* (1917), 186 Ind. 290. (Our emphasis.)

If the two remaining witnesses did not see Frank Scampmorte sign his name and the evidence so discloses, then as stated in the above quote in the Wersich case, it was obligatory upon the testator to acknowledge his signature in some manner to at least one of the two remaining witnesses.

There appears no reason, when attempting the probating of an alleged lost will, that the rules pertaining to its execution should be relaxed. This ██ application of strict construction of the legal requirements to the execution of a lost will is salutary and essential to minimize attempted fraud and deceit. Hence testimony in proof thereof should be carefully scrutinized.

It appears from the record and evidence most favorable to appellees, that the testator made no acknowledgment to either of the witnesses, Adelaide Hoostal or Helen Mable Moss, of his signature affixed to his will, when they entered the hospital room occupied by testator, nor did the evidence show that any legally qualified authorized person stated to said witnesses in said hospital room that the signature of testator had been so affixed to said purported will. From the evidence it appears that little had been said when the two nurses entered the testator's room to sign a will or a "thing." The evidence does disclose that one of the witnesses, other than Stottlemyer, casually greeted the patient, Scampmorte, when she entered the room, but received no response. It seems immaterial as to the conflict in the evidence whether the testator lay prone in bed on his back, or sat on the side of the bed while the two nurses as witnesses were in the

hospital room signing the purported will, since no evidence indicated testator either spoke or noticed that the nurses were in the room.

Appellant argues that the trial court erred in excluding certain testimony of the witness, Helen Mabel Moss. The question to which an objection was raised and sustained follows:

"Q. And at the time you signed the will, did you deviate from your normal custom or practice, at the time of the signing of the will, as compared to signing a Hospital — a surgical authorization?"

The offer to prove was that the witness would have answered the question by saying:

"That she would not have witnessed a paper unless the person or person's signature to be bound by the instrument, was on the instrument."

If the testator failed to acknowledge his signature, thence it seems immaterial whether said witness would or would not have attested her signature unless the testator's signature was thereon. The test in the instant case is not whether the witness saw the signature but whether the testator acknowledged the signature as his own. Inasmuch as it appears that the record is devoid of evidence to substantiate this point, we hold that the court committed no error in sustaining the objection of appellees to the admission of said testimony by the witness, Helen Mabel Moss.

In this action to probate a lost will, two questions were involved. The first was accomplished by the testimony of Garnet Stottlemyer, whose evidence, on that score was not contested. The question was whether all statutory requirements were complied with to con-

stitute a valid execution of said lost will. As heretofore stated, a rigid adherence to the statutory requirements of due execution is of paramount significance.

As stated heretofore, Frank Scampmorte entrusted the care of his will to his close friend, Garnet Stottlemyer, who placed it in a drawer in his Florida residence. Subsequently, upon recovery, the decedent returned to his Anderson home. Stottlemyer, approximately a year later, visited Scampmorte in Anderson and inquired about the "paper" left in his possession in this fashion:

> " 'Frank that paper we fixed up down there in the hospital that night,' I said, 'Do you want me to mail that thing up to you, when I go back,' and he said, 'No, throw it away, I've made other arrangements.' "

Stottlemyer, after returning to Florida, ran across the paper, and acting on Scampmorte's request said:

> "I pitched it down in that waste paper can."

Part of the testimony on direct examination of Garnet Stottlemyer follows:

> "Q. And then next what did you do? Immediately after writing this down?
> "A. Well, I suppose I read it back to him, and asked him, if that was the way he wanted it, and so on, and scratched a place across there, and he signed it, and I signed it.
> "Q. Now, what next did you do?
> "A. Well, I don't know for sure, we got a couple of those nurses our there, to come in and sign the thing, we told them we had a piece of paper or will, I don't know what I did tell them, we wanted them to sign their name on it.
> "Q. Do you know those nurses names?
> "A. I do now, I didn't then.
>
> .   .   .
>
> "Q. And, where did you go to get the nurses, if you went to get them?

"A. They were outside, they had a little, oh, you call it, kind of a station, where they keep the records . . . .

"Q. And how did you get to see and talk to them if you did?

"A. Well, I just went out there and walked up to them.

"Q. Did you make the request, in some nature, to them, is that what you are saying?

"A. Yes.

"Q. And what did they then do?

"A. Well, they came in there, in the office, or in the bedroom, where Frank was at.

. . . .

"Q. Did any conversation occur, at the time you and Frank Scampmorte and Mrs. Hoostal and Miss Moss, was in the room?

"A. I don't know — that's been a long time ago, I don't know, to tell you the truth about it.

"Q. Do you recall any conversation?

"A. No, I can't say that —

"Q. What did the nurses do?

"A. They signed the paper, I don't know — I know they signed it, I don't know whether they read it or not.

"Q. Where were you standing when they signed it? If you know?

"A. I don't know for sure, it was a small room, we were all there in that little room."

After stating to the best of his recollection, that during the time the nurses were in the bedroom, Scampmorte, the alleged testator, did not sit on the edge of the bed, and that the nurse, Miss Moss, asked no questions before she signed, Stottlemyer later stated a little dressing table stood on the north side of the bed. Continuing his direct-examination about the table:

"A. And that was at — right at Frank's side, where he could put something on it?

"A. Yea, Yea.

"Q. And is on that little table where the girls signed the will?

"A. I don't think so, I don't think they ever walked around that part of the room. I think — I don't remember for sure about that, but I imagine they probably signed on this dressing table —

"Q. I move to strike out his answer. I imagine, because that is not responsive to the question.

"A. All right, I don't know where they signed it, may be they held it up in their hands and signed it, I don't know.

"Q. Who had the — when the nurses walked, in, who had the paper?

"A. I imagine that I did. I don't know.

.  .  .

"Q. Do you know who had the paper when the nurses walked in?

"A. I don't know for sure.

"Q. Could Frank of had them?

"A. No, I am sure that he didn't have it.

"Q. Well, if Frank didn't have it, who had it?

"A. I either had it or it was laying there on the dresser, I'm sure, one or the other.

"Q. And who, if anyone, gave the paper to one of the nurses?

"A. I did.

"Q. And what did you say to her, when you gave it to her?

"A. I don't know for sure, I had asked them, 'If they would sign it and witness it'

"Q. Do you know to whom you gave it to first?

"A. I sure don't."

On cross-examination, Stottlemyer answered the following questions:

"Q. How long before you went out to get them, do you suppose it was that you and Frank had signed it?

"A. I don't know, it was within the next five, ten, to fifteen minutes or — I knew he had to have some more — we should have two more signatures on it, and I don't know whether it was right away or it could have been a matter of — I might have even looked out there and the nurses wasn't there, I don't know for sure. They didn't stay there all the time, they would go to their rooms and they would come back there, and I don't know.

"Q. Now when they came into the room, you stated, 'Frank was laying in bed?'

"A. Yes sir.

"Q. Tell the court, if Frank's — Scampmorte say anything, while they were in the room?

"A. Not that I remember, No Sir.

"Q. And then as soon as they signed that paper, 'they left' you testified, I believe?

"A. Yes.

. . .

"Q. When you heretofore testified, 'That it was out in the hall by the desk, when you asked the nurses, Miss Hoostal and Miss Moss, to sign the paper.' You don't recall having any further conversation about asking them to sign anything after they got in the room, do you?

"A. No, I don't."

As a part of direct examination of Garnet Stottlemyer, counsel for appellant directed questions to him relative to executing an affidavit to establish the content of the lost will, which he had thrown in a waste basket. A part of the record follows:

"Q. Now let's get this straight, they wanted you to sign something, and you said, 'That you would sign it, if it wouldn't beat the other kids out of some money,' is that it?

"A. Yes sir.

"Q. Mr. Stottlemyer?

"A. That's right.

"Q. What other kids were you referring to?

"A. To the other nieces and nephews.

"Q. Who was to pay the money, that the other kids were to get?

"A. Well, it would come out of what little Frank would get.

"Q. You wanted, in other words, did you want little Frank, to pay something to his cousins and sisters?

"A. That's right.

"Q. If you signed this will?

"A. Yes."

Appellees' attorney objected to this line of questioning, which was followed by a lengthy comment of appellant's counsel, relative to impeaching the testimony of Stottlemyer as a witness to the will. A repartee between the court and appellant's counsel followed, to-wit:

"JUDGE: Well, Mr. Shearer, you are trying to establish a will by this man, now why do you want to impeach him?

"MR. SHEARER: I want to show, well I'll go at it differently, let me go at it in a little different manner, maybe — I'll withdraw the question.

"JUDGE: It is my opinion Robert, that if you go ahead and impeach this witness, then you'll ruin all his testimony and you'll ruin any chances to prove a will, that would be my idea, go ahead."

We are confronted with the argument of appellant that his witness, Garnet Stottlemyer, displayed unwillingness to testify voluntarily about facts concerning testator's will totally within his knowledge; that he at one time anticipated signing a proof of will if he could control the disposition of the testator's estate.

While it may be said to appear that some responses of Stottlemyer to questions propounded on both direct and cross-examination were given in a somewhat hesitant manner and with the use of ungrammatical language, it is not the province of this court to weigh the evidence or pass upon the apparent credibility of the witness. The primary problem in this case is to probate a lost will which involves due and legal execution. The burden was upon the appellant to establish and the court to determine that fact.

From the record evidence it appears that the testator, Frank Scampmorte, at no time neither spoke to either of the witnesses, Adelaide Hoostal or Helen Mabel Moss, nor did he in any manner recogize their presence in the room. Neither of the two nurses was certain that the instrument they were asked to sign bore any signature. It further appears from the record most favorable to appellees that while the two nurses were in the room to sign the instrument presented as witnesses thereto, the alleged testator, Frank Scampmorte, said nothing and did nothing to indicate a request to attest his signature to his alleged will or to signify that he had signed the same.

We think that from the evidence before us, the court was justified in concluding that appellant failed to establish a valid execution of the alleged lost will of the testator; that the decision of the trial court is not contrary to law, and that the court did not err in overruling appellant's motion for a new trial.

Judgment affirmed.

Kelley, P. J., Pfaff, J., and Gonas, J., concur.

## ON PETITION FOR REHEARING

BIERLY, J.—Appellant filed no brief in support of his Petition for Rehearing, nor have appellees filed any objection or brief to said petition for rehearing.

Appellant charges error by the court on its opinion and decision:

"1. In holding that there must be testimony as to the execution of a will by at least two (2) subscribing witnesses in order to admit a will to probate, thereby contravening a ruling precedent of the Supreme Court to-wit, the case of *Hayes* v. *West,* (1871), 37 Ind. 21, which holds that only the testimony of one (1) subscribing witness is necessary to establish a will when offered for probate, although two (2) witnesses are required for a valid execution."

It appears that appellant has taken words out of context. In *Hayes et al.* v. *West et al.* (1871), 37 Ind. 21, the court said:

"If one witness, however, knows that he and the other witness or witnesses subscribed the will, as such, in the presence of the testator, *and at his request,* there seems to us to be no legal necessity for calling any more. One witness is sufficient to establish a will when offered for probate. 2 G. & H. 557, sec. 27." (Our emphasis).

It certainly is elementary that "only the testimony of one (1) subscribing witness is necessary to establish a will when offered for probate," provided, that said subscribing witness can satisfy the probate court by knowledge that two (2) competent subscribing witnesses "subscribed the will, *as such, in the presence of the testator and at his request."* (Our emphasis). *Hayes* v. *West, supra,* page 26.

The record does not disclose nor does the opinion hold that Garnet Stottlemyer testified that two (2) witnesses subscribed to the will of the testator *at his request.* (Our emphasis).

The second error of the court as claimed by the appellant in his Petition for Rehearing is in holding that:

"The test in the instant case is not whether the witness saw the signature but whether the testator acknowledged the signature as his own, for the reason that under the law of execution in effect at the time the will was executed, it was merely required that said will be attested and subscribed in the testator's presence by two (2) or more competent witnesses. Sec. 7-201 Burns', Ind. Stat., Annotated, 1933 (2 R. S. 1852, ch. 11, Sec. 18, p. 308.)"

We reply in answer thereto, a paragraph of our opinion, to-wit: As has been previously stated, the attesting witnesses need not

"'. . . see the testator sign the will, or that they should see his signature after he has signed, *it being sufficient that the testator, in some manner, makes known to them the fact that he has signed it.'* " *Wersich* v. *Phelps* (1917), 186 Ind. 290. (Our emphasis.)"

We think appellant's Petition for Rehearing does not possess sufficient merit to entitle him to a rehearing.

Petition for Rehearing denied.

NOTE.—Reported in 179 N. E. 2d 302. Rehearing denied 180 N. E. 2d 385.