David S. McCLAMROCH, et al. Appellants (Plaintiffs Below),

v.

Emily Marie McCLAMROCH, et al. Appellees (Defendants Below).

No. 4–683A189.

Court of Appeals of Indiana, Fourth District.

April 10, 1985.

Rehearing Denied May 16, 1985.

Eric T. Dean, Jr., James R. Earnshaw, Crawfordsville, for appellants.

Joseph R. Buser, Wernle, Ristine & Ayers, Crawfordsville, for appellees.

CONOVER, Judge.

The surviving children and two grandchildren (children) of decedent Charles M. McClamroch, Jr. (Charles) appeal the trial court's refusal to set aside a joint deed Charles executed in favor of himself and his second wife, Emily McClamroch (Emily).

We affirm.

ISSUES

We have restated and reordered the children's various contentions as the following five issues:

1. Whether the trial court erred in refusing to allow a witness to testify whose name had not been included in the children's final pretrial witness list.

2. Whether the trial court erred in admitting into evidence a letter to Charles from one of his daughters.

3. Whether the trial court erred in admitting into evidence a tape recording of a conversation involving Charles and Emily.

4. Whether the trial court erred in refusing to empanel an advisory jury.

5. Whether the deed should have been rescinded because it was procured through Emily's exercise of undue influence over Charles.

FACTS

Before the mid-1970's Charles had been a successful farmer in the Crawfordsville area. Eight children were born of his first marriage. However, during the mid-1970's, Charles's wife, mother, brother, and one son died. Charles was despondent for a considerable time thereafter.

About 1977 or 1978 Charles turned almost all the farming operation over to his partner and joined the Peace Corps. Charles was stationed in Costa Rica, where he made several acquaintances. He made several trips between Costa Rica and the United States, often arriving or leaving on very short notice. During his visits in this country Charles frequently wore Costa Rican clothing and spoke to American acquaintances in Spanish. During one visit Charles brought a young girl from Costa Rica to live with him. However, the record indicates Charles did monitor the farming operation during this time, and generally managed his business affairs.

Although the record is not entirely clear, Charles's most bizarre episodes generally occurred after his final return from Costa Rica. He drank heavily, and associated with a poorly-reputed group of young people, some of whom may have stolen from him. Medical assistance was summoned on several occasions, and on at least one occasion Charles referred to himself as "Carlos" and refused to speak to the attendants in English. During this period, Charles frequently stated his displeasure with his children because they did not visit him. Further, he felt they were critical of his lifestyle.

In January, 1982, Charles met Emily, a 46-year-old divorcee. They were married February 14, 1982. During the first weeks of their marriage, they quarreled frequently and drank on occasion. Charles apparently suffered a minor stroke during this period. In March, he was admitted to a mental hospital for treatment of depression. Although his doctors wanted to discharge him shortly after his arrival, Charles wanted to stay for 10 days. He was given a prescription for lithium, and released.

A few weeks later, in the early morning hours of April 2, police officers were summoned to the McClamroch home. They found Emily and Charles had been drinking, were arguing, and Emily was holding a hatchet. However, the matter was settled peacefully. Emily never left the home. A doctor called during the incident refused to commit Charles for further psychotherapy.

Notwithstanding these several episodes, for the most part after he met Emily, Charles's behavior improved. He no longer insisted on speaking Spanish to persons who did not understand the language, and dressed more appropriately. Moreover, Charles continued to manage his business affairs.

Charles's property had been held in an inter vivos trust while he was traveling to Costa Rica. After his marriage, Charles informed the trustee-bank he desired to cancel the trust and transfer the property back to himself and Emily in a joint deed. Charles's attorney carefully instructed Charles if the joint deed were executed and Emily survived him the property would not pass to his children. Charles stated he understood that consequence, and insisted

he wanted to make the deed. It was executed April 2.

After the deed was executed Charles's daughter, appellant Anne Warren, sent Charles a letter questioning the wisdom of his marriage and of the deed. Charles reacted angrily to this letter. Charles and Emily then tape recorded a conversation involving themselves, and other persons, during which Charles insisted he had executed the deed of his own free will. This tape eventually was admitted into evidence at trial.

Other relevant facts are discussed below.

## DISCUSSION AND DECISION

### I. *Exclusion of Witness*

During preliminary proceedings both parties exchanged witness lists. Subsequently, following the final pre-trial conference and orders, the parties filed final lists of witnesses and brief narratives of their anticipated testimony. The children neither submitted Officer Leonard's name with this list, nor a narrative of his anticipated testimony. Officer Leonard had answered the call at the McClamroch residence in the early morning hours of April 2.

The children presented testimony at trial concerning the April 2 incident. Emily testified this incident did not occur as described by the first officer witness. (R. 933) The children then attempted to call Officer Leonard. Because Officer Leonard had not been named on the final witness list the trial court sustained Emily's objection, refusing to allow him to testify. The children assert this refusal was an abuse of discretion.

■ Our courts generally have allowed trial judges wide discretion in regulating discovery and in enforcing pre-trial orders entered under Ind.Rules of Procedure, Trial Rule 16. This is particularly true where a pre-trial order has not been amended or supplemented under the rules, then has not been complied with at trial. *See generally Whisman v. Fawcett* (1984), Ind., 470 N.E.2d 73, 76–77; *North Miami Consolidated School District v. State ex rel. Manchester Community Schools* (1973), 261

Ind. 17, 19–20, 300 N.E.2d 59, 61–62; *Howard Dodge & Sons, Inc. v. Finn* (1977), 181 Ind.App. 209, 212, 391 N.E.2d 638, 641; *Colonial Mortgage Co. of Indiana, Inc. v. Windmiller* (1978), 176 Ind.App. 535, 538, 540–43, 376 N.E.2d 529, 532–34. In this case the children were aware of Officer Leonard's testimony. They had submitted his name as a witness in prior conferences. They have shown no reason his name could not have been included in the final witness list with a summary of his expected testimony. The trial court did not abuse its discretion in refusing to allow Officer Leonard to testify.

■ Moreover, any error in this regard was harmless. The children presented other substantial evidence concerning the April 2 incident between Emily and Charles. (R. 605–07, 615–16.) Officer Leonard's testimony merely would have been cumulative. The exclusion of cumulative testimony is not error. *State v. Edgman* (1983), Ind.App., 447 N.E.2d 1091, 1104–05; *see also Green v. Green* (1983), Ind.App., 447 N.E.2d 605, 609.

### II. *Admission of Warren Letter*

The trial court admitted, over the children's objection, the letter from Charles's daughter, appellant Anne Warren, dated April 25, 1982. (R. 150–51.) The children contend the letter was not relevant in this case because it could have had no bearing on Charles's state of mind when he executed the deed April 2, 1982. The letter expressed Ms. Warren's concern over whether Charles had been manipulated into the marriage with Emily and into jointly deeding the property. It questioned whether ultimately Charles would be reduced to poverty as a result. The letter suggested the relationship with Emily might be analogous to Charles's prior relationship with the young woman from Costa Rica.

■ Relevancy is the logical tendency of evidence to prove a material fact. *Indiana National Corp. v. Faco, Inc.* (1980), Ind.App., 400 N.E.2d 202, 206. A major

issue in this case is whether Charles jointly deeded the property to Emily at least partly as a result of feelings he had been abandoned by most of his children, and they had disapproved of his past behavior. Ms. Warren's letter provided relevant evidence as to this issue. It gave insight to the court as to the past relationship existing between Charles and his children. Thus, it was material evidence on that issue.

### III. *Admission of Tape Recording*

The children next contend the trial court erred in admitting a tape recording of a conversation between Charles, Emily, Charles's sister and Emily's father May 2, 1982. The children argue the tape was not sufficiently intelligible for admission into evidence, citing *Lamar v. State* (1972), 258 Ind. 504, 282 N.E.2d 795. Further, they argue it was not relevant. We disagree with both contentions.

*Lamar's* criteria for admission of tape recordings in criminal proceedings generally have been applied in civil cases. *See, In the Matter of Wireman* (1977), 270 Ind. 344, 351, 367 N.E.2d 1368, 1372, *cert. denied sub nom. Wireman v. Ind. Supreme Ct. Disciplinary Commission* (1978), 436 U.S. 904, 98 S.Ct. 2234, 56 L.Ed.2d 402; *In the Matter of the Estate of Baird* (1980), Ind.App., 408 N.E.2d 1323, 1330–31 and n. 11; *Indiana Bell Telephone Co., Inc. v. O'Bryan* (1980), Ind.App., 408 N.E.2d 178, 185–88. Tape recordings must, of course, be of such clarity as to be intelligible.

■ First, Emily argues clear, intelligible reproduction is particularly important for a jury. This was a bench trial, however. The tape was not forwarded as part of the record, but we have been provided with an extensive transcript of the conversations it contained. (R. 847–915.) While the transcript reveals gaps in the conversation, it reveals overall a steady flow of conversation between those present. The record reveals no evidence of tampering or erasing, or it required repetitive playing before it could be transcribed as occurred in *Lamar, supra.* The record supports the trial court's determination the tape was sufficiently intelligible to be admitted.

■ The children also argue the taped conversation was not relevant. However, during the conversation Charles at several points emphasized he voluntarily chose to execute the deed. At one point, he said Ms. Warren's letter was indicative of his relationship with his children. At another he expressed his continued determination his children would not inherit the farm. This conversation was relevant to several issues.

### IV. *Advisory Jury*

The children contend the trial court abused its discretion when it refused to empanel an advisory jury. See T.R. 39(B). We disagree.

■ The parties correctly agree a suit to set aside a deed is submitted to the equitable jurisdiction of the trial court. There is no constitutional right to a jury trial in suits involving equitable considerations. *Monnett v. Turpie* (1892), 132 Ind. 482, 484–85, 32 N.E. 328, 329; *Daugherty v. Daugherty* (1947), 118 Ind.App. 141, 145, 75 N.E.2d 427, 429; *Carpenter v. Willard Library Trustees* (1901), 26 Ind.App. 619, 621, 60 N.E. 365, 366; IND. CONST. Art. I, § 20. Accordingly, the children's claim is governed entirely by T.R. 39(B).

The rule provides in pertinent part:

(B) By the court—Advisory jury—Trial by consent. In any case where there are issues ... upon which there is no right to trial by jury as of right, the court may submit any or all of such issues to a jury for trial. The verdict shall be advisory unless, before the jury retires, the court, with the consent of both parties or their attorneys, orders that the verdict shall have the same effect as if a trial by jury had been a matter of right. Such order shall be granted at the court's discretion[.]

■ In the first instance, the court need not submit equitable issues to a jury, even though both parties request such sub-

mission. Further, in this case, the parties did not even agree to have the suit or any specific issues tried by a jury. The request for an advisory jury was left to the trial court's discretion, which will be reversed only for a manifest abuse thereof. *See* 3 W. HARVEY, INDIANA PRACTICE at 193 and authorities cited.

## V. *Undue Influence*

We discuss several of the children's contentions and sub-issues in terms of whether the evidence at trial demonstrated the joint deed was procured by Emily's undue influence over Charles, and, thus, whether the deed should be set aside under the doctrine of constructive fraud. The record supports the trial court's determinations, and we find no error.

■ We initially dispose of two collateral contentions. First, the children somewhat ambiguously argue the trial court did not apply "equitable principles" in rendering judgment. They appear to argue the trial court should have apportioned the property in a "fair" manner, and in so doing should have apportioned part of the property to the children without supporting authority. In proceedings to set aside a deed, the deed is either set aside or it is not. If valid, the deed governs disposition of the property. If set aside, the court must leave the parties where it finds them. It has no authority to enter an order "fairly" distributing property in such case. Those matters are for the probate, not the trial court.

Next, at several points in their brief the children argue the 59 "Findings of Fact" and 11 "Conclusions of Law" were not sufficient under T.R. 52.

■ First, Emily's argument the children cannot complain about the specificity of the findings because they did not request findings under T.R. 52 is well taken. When the parties do not request special findings under T.R. 52, but the trial court voluntarily enters findings this court considers the case as decided upon a general judgment supported by partial findings.

Such judgment must be affirmed if sustainable on any theory, if such theory is not contrary to any of the findings of fact. *See, Mishawaka Brass Mfg., Inc. v. Milwaukee Valve Co., Inc.* (1983), Ind.App., 444 N.E.2d 855, 858 (Garrard, J. concurring), *citing, Hunter v. Milhous* (1974), 159 Ind.App. 105, 122–23, 305 N.E.2d 448, 459.

## A. *Standard of Review*

The children argue the trial court erred, as a matter of law, in refusing to set aside the deed because it was executed as a result of Emily's undue influence over Charles. This court recently explained the procedure we use to review such claims in *Lucas v. Frazee* (1984), Ind.App., 471 N.E.2d 1163.

■ Certain legal and domestic relations, including the husband-wife relationship, raise a presumption of trust and confidence on the one side and a corresponding influence as to the dominant party on the other. If the plaintiff's evidence demonstrates (a) the existence of such a relationship, and (b) the questioned transaction between those parties resulted in an advantage to the dominant party, the law imposes a presumption the transaction was the result of undue influence, constructively fraudulent and thus void. To demonstrate the validity of the transaction in such cases, the dominant party must rebut the presumption of undue influence by clear and unequivocal proof. *Id.*, 471 N.E.2d at 1166–67 and authorities cited. Similar concerns may arise between parties not involved in a classically recognized fiduciary relationship, but in those cases a plaintiff bears the burden to establish a transaction resulting in favor of the allegedly dominant party *and* the existence of a confidential relationship with that party, before the presumption arises in the plaintiff's favor.

■ In *Lucas* the transferor failed to demonstrate the relationship with her sister became a confidential relationship. Thus we held the plaintiff was appealing a general *negative judgment* supported by partial findings by the trial court. In this case, by contrast, Emily was more than 20

years younger than Charles, he had experienced episodes of bizarre behavior and some physical health problems during the period immediately before their marriage, and he experienced psychiatric problems shortly before the transaction which benefited Emily, his wife. Thus, in this case the presumption of undue influence did indeed arise by operation of law, requiring Emily to rebut the presumption by clear and unequivocal proof. Accordingly, the children do not appeal only the question of whether the judgment is contrary to law (the negative judgment standard), "but also whether the dominant party's evidence is sufficient to sustain the judgment under the clear and unequivocal proof standard." *Id.*, 471 N.E.2d at 1167, *citing Brock v. Walton* (1983), Ind.App., 456 N.E.2d 1087, 1091 (similar principles apply to review of a successful contributory negligence defense).

■ Our review is complicated, though not adversely so, by the partial findings and conclusions. Our review of findings by a trial court is governed by the "clearly erroneous" standard of T.R. 52(B). In cases where, as in *Lucas*, the trial court enters findings adversely to the party which carried the burden of proof on the issue, under the mandate of T.R. 52(B) we will reverse only where the evidence "is uncontradicted and supports no reasonable inferences in favor of the decision ... or, even when there is evidence supportive of the judgment if our review of the record leaves us with a 'definite and firm conviction a mistake has been made.'" *Lucas*, 471 N.E.2d at 1166, *quoting Burnett v. Heckelman* (1983), Ind.App., 456 N.E.2d 1094, 1097. This formulation obviously resembles the familiar negative judgment standard we use to review an appellant-plaintiff's claim against an adverse jury verdict.

■ However, where, as in this case, the findings are in favor of the party who carries the burden to establish an issue, i.e. Emily's burden to rebut the presumption of undue influence, the "clearly erroneous" standard is articulated in terms of whether there is substantial evidence of probative value supporting the findings, or, even if there is evidence which supports the judgment we are left with a definite and firm conviction a mistake has been made. *See, e.g. Campins v. Capels* (1984), Ind. App., 461 N.E.2d 712, 717. Whichever formulation of the "clearly erroneous" standard we employ, however, we will neither reweigh the evidence nor judge the credibility of the witnesses, and will view the record in a light most favorable to the judgment.

### B. *Presumption of Undue Influence Rebutted*

The children contend the evidence of Charles's despondence following the deaths of his wife, mother, brother, and son in rapid succession, his bizarre conduct upon returning from Costa Rica, his marriage to Emily shortly after they became acquainted, and his psychological and physical problems immediately following the marriage, demonstrate he was not of sound mind when he executed the deed. Because of this state of affairs and the gain to Emily, the fiduciary, the presumption of undue influence arises, voiding the deed to her, the children opine. However, Emily's evidence is substantial. It supports an inference Charles was competent and executed the deed because of his own free will, uninfluenced by Emily.

Charles for several years had been dissatisfied with the relationship existing between himself and his children. Further, Charles was aware of his farming and related business affairs, even during the late 1970's and until his marriage to Emily. While the record shows patterns of bizarre behavior after Charles's return from Costa Rica, and he continued to suffer from physical problems and depression after he married Emily, it also shows his behavior became more appropriate after he met Emily. The April 2, 1982 early morning "hatchet" incident, which the children emphasize heavily in their brief, actually involved an argument which started after Emily and Charles had been drinking. It was settled peacefully.

The record conclusively demonstrates Charles behaved appropriately during counseling immediately before his marriage to Emily, at the wedding, and during the reception. Witnesses who conducted business affairs with Charles after the wedding testified Charles seemed alert and understood what he was doing.

As to the deed in question, after his attorney advised him of the deed's effect on his property, Charles indicated he understood what he was doing and expressed irritation at the possibility the attorney was trying to get him to change his mind. Emily was present when the deed was discussed and executed. However, she only observed the transaction. She neither urged nor cajoled Charles into signing it.

Quite simply, there is no substantial evidence in this record Emily manipulated or forced Charles to execute the deed. This record is clear and convincing on the point. Thus, substantial evidence of probative value is present here which rebuts the presumption of undue influence arising by virtue of the husband-wife relationship. We are not definitely and firmly convinced a mistake has been made.

Judgment affirmed.

MILLER, P.J., and YOUNG, J., concur.