Cletus REISS, as Special Administrator for the Estate of Mary K. Himelick, Appellant (Plaintiff Below),

v.

Frank J. REISS and Marion Reiss, Appellees (Defendants Below).

No. 4–1285A347.

Court of Appeals of Indiana, Fourth District.

Nov. 25, 1986.

Rehearing Denied Jan. 13, 1987.

494 N.E.2d 1001 (pet. transfer pending).

Sharon Funcheon Murphy, Bartlett & Robb, Lafayette, for appellant.

Michael J. Stapleton, Ball, Eggleston, Bumbleburg & McBride, Lafayette, for appellees.

YOUNG, Judge.

This is an appeal from an action brought on behalf of the estate of Mary K. Himelick. The estate requested that a constructive trust be imposed on funds which Frank Reiss transferred to himself and his wife, Marion, upon the death of Himelick. The funds were transferred from bank accounts that he held jointly with the decedent. The trial judge ruled in favor of Frank and Marion Reiss on the basis that the estate had failed to prove that Frank Reiss had exercised undue influence over Himelick when the joint accounts were created. The estate raises the following issues:

1) Whether the estate had the burden of proving that Frank Reiss exercised undue influence over Himelick when the joint bank accounts were created; and

2) Whether the trial court erred in admitting into evidence an unsigned and undated document which appears to contain some post-death instructions written by Himelick.

We reverse on the basis of the first issue and remand for further proceedings consistent with this opinion.

Mary K. Himelick died testate on April 15, 1982. In her will, which was executed shortly after she had moved to Lafayette from Arizona, Himelick made several specific bequests. These included a $10,000.00 bequest to her sister, Lena Donovan. The funds were located in an Arizona account which was being transferred to Lafayette. A few days after the will was written and the transfer was completed, the funds were used to purchase a $10,000.00 certificate of deposit at the Lafayette Bank & Trust Company. The certificate named Himelick and Lena Donovan as joint owners. The residue of Himelick's estate was to be shared equally among Himelick's surviving siblings and her brother-in-law. During the time Himelick lived in Lafayette she maintained her own apartment and did her own shopping and cooking. She also drove her own car occasionally but rarely went out in the winter because of the ice and snow. She also made gifts of several tangible items to family and friends who testified that she realized what she was doing when the gifts were made.

In addition to writing Himelick's will, Himelick's attorney assisted her in setting up several bank accounts. He had some difficulty in transferring the funds to Lafayette because Himelick did not know the amount and locations of her Arizona ac-

counts. Himelick also owned a large number of stocks and bonds. Her attorney attempted for several months to locate the certificates for these stocks and bonds for income tax purposes. These certificates were found when Himelick gave her attorney a packet which her husband had left to her. Himelick told her attorney that she did not know what the papers were but that he could have them for whatever they were worth. Shortly after this episode, Marion Reiss called the attorney and asked what he was doing with the stocks. When he told her that they were being evaluated, she replied that she wanted to know because there is "a little bit of larceny in all our hearts." After the stocks and bonds were evaluated, the attorney gave them to Himelick and told her to put them in her safe deposit box.

After the Lafayette accounts were opened, Himelick's brother, Frank Reiss, informed other family members that Himelick was incapable of handling her financial affairs. He requested the banks to notify him if large sums were withdrawn. He also counted the money Himelick had in her purse every Sunday. From 1976 to 1981, Himelick's niece made out her deposit slips because Himelick was unable to do so. The niece also drove Himelick to the various banks because Himelick was unable to locate them.

Between 1978 and 1981, seven out of eleven of Himelick's accounts were transferred to joint ownership with Frank Reiss. These transactions were as follows:

I. Lafayette Bank & Trust

A. Savings #40–97418-3 ($609.46)
1. Opened 1/3/77
Joint Owners: Mary Himelick and Lena Donovan
2. Transferred 8/3/81 ($587.50)
Joint Owners: Mary Himelick and Frank Reiss

B. Certificate of Deposit #40–27536 ($10,244.79)
1. Purchased as CD#40–26785 on 1/31/77
Joint Owners: Mary Himelick and Lena Donovan
2. Replace with CD#40–27536 on 8/3/78
Joint Owners: Mary Himelick and Frank Reiss

II. Purdue National Bank

A. Savings #5–158–621–1 ($9,169.21 + 18.95)
1. Opened as Account #5–128–743–5 on 6/1/78
Joint Owners: Mary Himelick and Lena Donovan
2. Transferred on 11/19/81 ($10,069.21)
Joint Owners: Mary Himelick and Frank Reiss
3. Transferred on 6/15/82
Joint Owners: Frank and Marion Reiss

B. Savings #5–116–436-8 ($13,187.87 + 27.25)
1. Opened 5/4/77 ($10,000.00)
Owner: Mary Himelick
2. Transferred 4/10/78
Joint Owners: Mary Himelick and Frank Reiss
3. Transferred 4/27/82
Joint Owners: Frank and Marion Reiss

C. Checking Account #2–084-865-5 ($1,494.24)
1. Opened 11/27/81 ($300.00)
Joint Owners: Mary Himelick and Frank Reiss
2. Transferred 4/27/82
Joint Owners: Frank and Marion Reiss

III. First Federal Savings and Loan

A. Certificate of Deposit #51246–25 ($6,373.36)
1. Purchased 2/14/77
Owner: Mary Himelick
2. Transferred 11/21/81
Joint Owners: Mary Himelick and Frank Reiss

B. Certificate of Deposit #51248–25 ($6,373.36)
1. Purchased: 2/14/77
Owner: Mary Himelick
2. Transferred 11/21/81
Joint Owners: Mary Himelick and Frank Reiss

The Lafayette Bank & Trust $10,000.00 certificate was originally held in joint ownership with Himelick's sister. It was also covered under a specific bequest to that sister in Himelick's will. Himelick continued to refer to this certificate as belonging to her sister even after it was transferred to joint ownership with Frank. Furthermore, a Lafayette Bank and Trust officer testified that he thought the reason these accounts were set up as joint accounts was to provide for Himelick's burial expenses. Frank admitted that a $10,000.00 joint savings account which Himelick held with Lena Donovan at Purdue National Bank was transferred to a joint checking account between Himelick and himself so that he could pay Himelick's burial expenses. (R. 198)

The last five transfers were all made within a relatively short period of time and while other close relatives were out of town. First Federal Savings and Loan contacted Himelick's attorney when the accounts they held were requested to be transferred from Himelick to Frank and Himelick as joint owners. The attorney informed the bank that Himelick did not understand what she was doing because she was incapable of grasping intangible concepts. After this occurred, Frank told Himelick that her attorney was trying to

steal her money. Subsequently, the safe deposit box that Himelick jointly held with her attorney was transferred to joint ownership with Frank. Frank retained the only key.

At one point, Himelick attempted to transfer to Cletus Reiss a $30,000.00 note which she thought was in Frank's name. Her explanation for doing this was that "that s.o.b. is trying to get all of my money." The note, however, never existed. When Cletus informed Frank of the episode, Frank offered no explanation.

On March 31, 1982, Himelick entered the hospital to undergo surgery for the removal of several brain tumors. Her doctor testified that some of these tumors would have made Himelick "tractable and easy to take care of" during at least the last five years of her life. When notified that Himelick was dying, Frank went to the bank and emptied the safe deposit box. Himelick died before Frank reached the hospital. Frank then locked Himelick's apartment so that no one else had access. Despite telling Cletus Reiss that he found $1,000.00 in Himelick's apartment, Frank turned only $15.00 over to the administrator. Frank also refused to turn over the bank accounts he held jointly with Himelick, including the one which he admitted was for burial purposes. (R. 480)[1] The estate requested the trial court to impose a constructive trust on funds from these accounts. The court held in favor of Frank and Marion Reiss on the grounds that the estate had failed to prove Frank had exercised undue influence over Himelick when the joint accounts were created.

The estate claims that the trial court erred in placing the burden of proving that Frank Reiss exercised undue influence over Mary Himelick. We agree.

■ In order for a constructive trust to be imposed, actual or constructive fraud must be present. *Melloh v. Gladis* (1974), 261 Ind. 647, 309 N.E.2d 433. Constructive fraud may arise in the violation of a confidential relationship which results in a benefit to the dominant party in that relationship. *Troyak v. Enos* (7th Cir.1953), 204 F.2d 536. A party who seeks to have a constructive trust based upon such a violation has the burden of proving, by clear and convincing evidence, that a confidential relationship existed and that the dominant party to the relationship sustained an advantage. *McClamroch v. McClamroch* (1985), Ind.App., 476 N.E.2d 514. Once the relationship and benefit are established, however, the burden shifts to the dominant party to disprove the exercise of undue influence in obtaining the benefit. *Given v. Cappas* (1985), Ind.App., 486 N.E.2d 583; *McClamroch v. McClamroch, supra; Hall v. Indiana Dept. of Revenue* (1976), 170 Ind.App. 77, 351 N.E.2d 35. The dominant party must rebut the presumption of undue influence by clear and unequivocal proof. *McClamroch v. McClamroch, supra.*

A confidential relationship is not limited to the classical examples of fiduciary relationships. *Hunter v. Hunter* (1972), 152 Ind.App. 365, 283 N.E.2d 775. The relationship therefore may exist between siblings. *Melloh v. Gladis, supra.*

■ While Frank and Marion Reiss contend that no confidential relationship existed between Frank Reiss and Himelick, we can only infer that the trial court found that one did exist. Its holding was based upon the estate's failure to prove undue influence rather than a failure to prove the existence of a confidential relationship. The trial court did not need to reach the issue of undue influence unless it found the existence of a confidential relationship. Furthermore, there appears to have been

---

1. At oral argument, the Reiss' attorney stated that Frank had offered to turn this money over to the estate but the estate refused. We find nothing in the record to support such a statement. Frank Reiss did testify that on the day after the funeral he was going to tell Lena Donovan that he would pay all the medical and funeral expenses, but that he was interrupted by Lena's husband and Cletus Reiss' wife who stated that they would be talking to Himelick's attorney. (R. 227) This was not an offer to turn funds over to the estate or a refusal of the funds by the estate. When the estate made a demand for the funds, Frank refused. (R. 480)

clear and convincing evidence of such a relationship.

> [A] confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other ... Not only must there be confidence by one party in the other, the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge ...

*Hunter, supra* 283 N.E.2d at 779.

The record indicates that Himelick lacked knowledge of financial matters and that Frank influenced her decisions as to who to trust in that regard. After Frank told Himelick that her attorney was trying to steal her money, she changed the joint ownership of her safe deposit box from her attorney to Frank. There was also clear and convincing evidence, and Frank and Marion Reiss do not dispute, that Frank received a benefit from his relationship with Himelick.

Having proven that a confidential relationship existed and that Frank received a benefit from it, the burden of proof would normally shift to Frank and Marion Reiss to disprove the exercise of undue influence. This case is unique, however, because a statute regarding joint accounts is involved. This statute provides:

> Sums remaining on deposit at the death of a party to a joint bank account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time that the account is created.[2]

IND.CODE 32–4–1.5–4.

It is apparently the Reiss' argument that this statutory presumption overrides the presumption of undue influence where joint bank accounts are involved. This situation has arisen in only one other Indiana case.[3] In *Givens v. Rose,* the personal representative of a deceased incompetent's estate brought an action against the decedent's sister and brother-in-law to recover funds acquired through a jointly held checking account and certificates of deposit. (1978), 178 Ind.App. 590, 383 N.E.2d 448. After holding that the decedent's sister clearly had the burden of proving good faith and that she had failed to justify the removal of funds from the account, the First District stated it was "mindful" that joint accounts with the right of survivorship were involved. *Id.* 383 N.E.2d at 454. The court then quoted the following language from *In Re the Estate of Fanning:*

> Without an expression to the contrary, the third party donee-beneficiary contract creates a rebuttable presumption that the usual rights incident to jointly owned property with the right of survivorship was [sic] intended.... The burden of proof is on the party who wishes to show a contrary intent from that expressed in the contract.[4]

(1975), 263 Ind. 414, 333 N.E.2d 80. The court then stated that it believed the estate had sustained this burden. The court never explained exactly what effect the presumption of intent had on the constructive fraud presumption of undue influence. It simply concluded that the defendant failed to rebut the presumption of undue influence and that the plaintiff met the burden of establishing a contrary intent.

Perhaps *Givens* stands for the proposition that the plaintiff must prove contrary intent despite the defendant's failure to

---

**2.** This statute became effective January 1, 1977. While some jurisdictions have statutes which explicitly except cases of fraud or undue influence from the presumption, our statute was taken verbatim from the Uniform Probate Code. The official comments to that Code do not discuss the provision in relationship to fraud or undue influence.

**3.** While the estate argues that *Rogers v. Rogers* provides guidance in the interpretation of IC 32–4–1.5–4, the case is distinguishable. (1982),

Ind.App., 437 N.E.2d 92. In *Rogers,* the depositor was suing to regain funds which he had placed in a joint account with his son who had withdrawn them. Hence, the decision was based upon IND.CODE 32–4–1.5–3 rather than 32–4–1.5–4.

**4.** The quotation from *Fanning* was used rather than the statute because the accounts were created prior to the effective date of IC 32–4–1.5–4.

disprove undue influence. This seems contradictory, however, given the definition of undue influence.

> Undue influence may be defined to be the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.

> Undue influence exists when, through weakness, ignorance, dependence, or implicit reliance of one on the good faith of another, the latter obtains an ascendency which prevents the other from exercising an unbiased judgment.

*Blaising v. Mills* (1978), 176 Ind.App. 141, 374 N.E.2d 1166 (*quoting Folson v. Buttoph* (1924), 82 Ind.App. 283, 295, 143 N.E. 258, 262). The important issue in undue influence cases therefore appears not to be whether the weaker party intended to act as he did but whether his judgment in forming that intent was biased as the result of the control exercised by the dominant party.

Only one jurisdiction has clearly determined the effect of the statutory presumption of the joint tenant's ownership on the presumption of undue influence. In *Estate of Mehus,* the North Dakota Supreme Court held the estate to be the owner of joint bank accounts despite a joint bank account statute identical to ours. (1979) N.D., 278 N.W.2d 625. In doing so, the court stated:

> Even if we assume [the statute] creates a presumption in favor of a surviving joint tenant, that statute presumes a validly created joint account in the first instance. However, in this case, the account was invalidly created through the violation of a fiduciary duty, the presumption never arises and consequently has no effect.

*Id.* at 634.[5]

■ We agree with the North Dakota Supreme Court's resolution of the issue.

We therefore hold that when a constructive trust is sought to be imposed upon joint bank accounts, the burden is placed upon the surviving joint tenant to disprove undue influence once a confidential relationship and a benefit to the dominant party have been proven by the estate. We conclude as a matter of law that the estate proved by clear and convincing evidence that a confidential relationship existed between Himelick and Frank and that Frank received a benefit from this relationship. It follows that the trial court erred in placing upon the estate the burden of proving undue influence and therefore we reverse. As this opinion represents a new interpretation of Indiana law, we also remand solely to afford Frank and Marion Reiss the opportunity to meet their burden of disproving undue influence.

■ The estate also claims that the trial court erred in admitting into evidence an unsigned and undated document which contains some post-death instructions written by Himelick. We disagree, but discuss the issue since it may arise on remand.

At trial, the court admitted a document which contained the following information:

> Burial—Jonesboro Ind—(Call Ray Himelick)

> Frank Reiss—(brother) to handle entire funeral service *Lafayette Bank & Trust Co.*

> Money—entire to Frank Reiss Lafayette Bank & Trust

> Lafayette Bank and Trust Company— When I pass away entire goes to Frank Reiss

> Frank to have key—Lafayette Ind (Lafayette Bank & Trust Company)

The estate claims that the document is inadmissible as it purports to be a testamentary disposition and fails to meet the requirements of witnessing, signing and dating. Frank claims it was admissible to

---

5. We realize that a fiduciary rather than a confidential relationship was involved in *Mehus.* We do not think the distinction to be an important one, however, given that the court's point is that the statutory presumption only arises if the

bank account is validly created. The use of undue influence in a confidential relationship would destroy the validity of the bank account's creation in the same manner as would the violation of a fiduciary duty.

show Himelick's state of mind at the time she wrote it.

The estate's argument is misplaced. Witnesses and signatures are required when a document is admitted to probate for the purpose of showing the decedent's intent as to the disposition of her property upon death. IND.CODE 29–1–5–3; *Scampmorte v. Scampmorte* (1962), 133 Ind.App. 276, 179 N.E.2d 302. This document was admitted, not for probate, but for the purpose of rebutting the presumption of undue influence in the constructive trust situation. Parol evidence is admissible to establish a constructive trust. *Givens v. Rose, supra.* It follows that parol evidence is admissible to rebut the presumption of undue influence to defeat the imposition of a constructive trust. *See* 76 Am.Jur.2d *Trust* § 628 (1975) and cases cited therein. The court therefore did not err in admitting this document.

Reversed and remanded.

CONOVER, P.J., and MILLER, J., concur.