**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**July 21, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2019AP846**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CV445

**IN COURT OF APPEALS**
**DISTRICT III**

---

GORDON KOSOBUCKI,

  PLAINTIFF-RESPONDENT-CROSS-APPELLANT,

DENNIS KOSOBUCKI AND KARL KOSOBUCKI,

  PLAINTIFFS-CROSS-APPELLANTS,

  V.

MARLENE A. KOSOBUCKI AND JOHN P. KOSOBUCKI,

  DEFENDANTS-APPELLANTS-CROSS-RESPONDENTS.

---

APPEAL and CROSS-APPEAL from judgments of the circuit court for Marathon County: LAMONT K. JACOBSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.    This appeal involves a dispute between the children of John A. Kosobucki.[1]    A jury awarded Kosobucki's son Gordon $625,000 on his defamation claim against two of his siblings, John and Marlene.   John and Marlene argue the evidence was insufficient to support the jury's finding that, in making the statements in question, John and Marlene abused the family member well-being privilege.   In the alternative, John and Marlene argue the circuit court should have reduced the jury's award of $625,000 in damages.   We reject these arguments and affirm the jury's verdict in favor of Gordon on the defamation claim.

¶2      Gordon and his two other brothers, Dennis and Karl, cross-appeal, arguing the circuit court erred by rejecting their undue influence claim against John and Marlene.   Gordon, Dennis, and Karl also argue that they were entitled to have a jury, rather than the circuit court, determine whether they had proved their undue influence claim.   Again, we reject these arguments and affirm.

## BACKGROUND

¶3      Kosobucki and his wife, Marilynn, had five children:   John, Marlene, Gordon, Dennis, and Karl.   In approximately 1975, John and his wife became estranged from Kosobucki and Marilynn.   In 1993, Kosobucki and Marilynn created the Kosobucki Revocable Trust ("the Trust").   The Trust specifically disinherited John and provided that after certain distributions were made, the remaining trust assets would be divided equally between Gordon, Dennis, Karl, and Marlene.

¶4      Marilynn died in 2003.   In 2004, Kosobucki underwent heart surgery. Thereafter, Marlene—who had been living in Minnesota—moved into Kosobucki's

---

[1] For the remainder of this opinion, we refer to John A. Kosobucki as "Kosobucki."   For ease of reading, we refer to other members of the Kosobucki family by their first names.

home in Weston, Wisconsin, to assist him with tasks like cooking and shopping. Marlene continued living with Kosobucki until 2008, when she moved back to Minnesota. Karl testified at trial that Marlene's relationship with Kosobucki was "very difficult" while they lived together. Gordon testified that after Marlene moved out, Kosobucki "didn't trust her because she had done some things and lied about it."

¶5 In April 2009, Kosobucki amended the Trust to provide that, upon his death, $25,000 would be distributed to John. As before, the Trust continued to provide that after that and other specific distributions were made, the remainder of the trust assets would be divided equally between Gordon, Dennis, Karl, and Marlene.

¶6 In January 2010, Kosobucki suffered a stroke. According to Gordon, Kosobucki ultimately recovered "about 85, 90 percent," but he was unable to drive. Kosobucki's physician felt that he should not be living alone full-time, but Kosobucki did not want to move into an assisted living facility. Gordon, who lived in Stoughton, Wisconsin, therefore agreed to travel to Kosobucki's home and stay with Kosobucki for several days each week in order to provide care for him. In exchange, Kosobucki agreed to pay Gordon $2500 per month, plus his gas expenses.

¶7 In January 2011, Kosobucki wrote a check on his account at U.S. Bank to purchase $61,148 in gold and silver as an investment. Kosobucki subsequently purchased an additional $44,234.15 in gold and silver in August 2012.

¶8 By the fall of 2014, Kosobucki was ninety-one years old. According to Gordon, in August 2014, Kosobucki informed him that he wanted to pay off Gordon's mortgage. Gordon testified he told Kosobucki that was not necessary, but Kosobucki continued to bring up the topic of paying off Gordon's mortgage in

subsequent conversations. Gordon testified he told Dennis—who was at that point the co-trustee of the Trust—that Kosobucki wanted to pay off Gordon's mortgage. Dennis stated Gordon should allow Kosobucki to do so, and Gordon ultimately permitted Kosobucki to pay off his mortgage.

¶9 Gordon further testified that around the same time, Kosobucki insisted on paying Gordon $30,000 for a new vehicle and $12,000 for repairs to Gordon's house. In addition, Gordon testified that in September 2014, Kosobucki stated he wanted Gordon to have the gold and silver that Kosobucki had previously purchased as an investment. Gordon therefore took the gold and silver from Kosobucki's home the following month.

¶10 Kosobucki was hospitalized in December 2014 after experiencing severe back pain. After staying in the hospital for several days, Kosobucki was transferred to Stoney River, a rehabilitation facility. Marlene visited Kosobucki at Stoney River on December 18. She testified that four to six weeks before that date, Kosobucki had asked her to check whether the gold and silver he had previously purchased were still in the hiding place where Gordon had told Kosobucki they were located. When Marlene checked the hiding place, it was empty. She asked Kosobucki whether he wanted her to talk to Gordon about the missing gold and silver, but Kosobucki stated he would "take care of it."

¶11 Marlene further testified that when she arrived at Stoney River on December 18, 2014, Kosobucki immediately told her that he was concerned because Gordon's demeanor had changed. He then asked Marlene to go to his bank and check how much money was in a checking account that he shared with Gordon. Kosobucki stated he expected there to be "six figures" in that account. Marlene's investigation at the bank, however, showed that the balance of the account was only

4

$17,000. Marlene relayed that information to Kosobucki and asked what he thought had happened. According to Marlene, Kosobucki responded that "the only other name on the account is Gordon's, so who else could have taken the money."

¶12    Kosobucki then directed Marlene to have Gordon's name removed from the checking account, which she did. Kosobucki told a social worker at Stoney River that Gordon would not "handle it well" if he found out that his authority to access Kosobucki's checking account had been removed. He therefore requested that the social worker contact adult protective services on his behalf.

¶13    The following day, Marlene returned to the bank to investigate what had happened to the money in Kosobucki's checking account. She then discovered a check written to Associated Bank on August 27, 2014, in the amount of $133,000, which had been used to pay off Gordon's mortgage. She also discovered a second check dated August 27, 2014, that was written to Gordon in the amount of $44,725. Marlene told Kosobucki about the two checks, and he was adamant that he did not authorize those transactions.

¶14    Marlene then suggested to Kosobucki that they contact her brother John because he had a law enforcement background, and Kosobucki agreed that Marlene should do so. Thereafter, John and Marlene continued to investigate Kosobucki's missing assets. When confronted regarding the August 27, 2014 checks, Gordon acknowledged that those funds had been used for his benefit, and he also acknowledged taking the gold and silver from Kosobucki's home. He maintained, however, that those assets were gifts from Kosobucki, which Kosobucki had subsequently forgotten.

¶15    On December 23, 2014, with John's assistance, Kosobucki filed a petition for a temporary restraining order against Gordon. As part of that process,

5

Kosobucki filed an affidavit stating that he never authorized Gordon to take his gold and silver and did not authorize the August 27, 2014 checks. At the restraining order hearing, Kosobucki testified in closed chambers without any family members present that he had never agreed to pay off Gordon's mortgage or buy him a new vehicle, but he had instead offered to pay one month of Gordon's mortgage and to pay for about $400 of vehicle repairs. John and Gordon also testified in open court during the restraining order hearing. The circuit court, the Honorable Gregory Huber presiding, ultimately granted a restraining order prohibiting Gordon from having contact with Kosobucki for a period of four years.

¶16 Also in December 2014, Kosobucki made several changes to his estate plan, with the assistance of attorney David Eckert, who had previously updated Kosobucki's estate plan in 2009 and 2012. Eckert met with Kosobucki alone, outside the presence of any family members. Kosobucki told Eckert he was concerned that Gordon had stolen gold from him and had used Kosobucki's money to pay off Gordon's mortgage and pay for vehicle expenses. Kosobucki then detailed various changes that he wanted to make to his estate plan, which included disinheriting Gordon and granting John a share of the remainder of the trust estate. At trial, Eckert testified he had "no sense that [Kosobucki] was acting by coercion or influence" and he thought Kosobucki "was quite clear about what he wanted to do and why he wanted to do it."

¶17 Eckert made the requested changes to Kosobucki's estate plan and then met with Kosobucki a second time about one week after their initial meeting. Eckert brought two witnesses to this second meeting, one of whom was Jeffery Isaacson, Kosobucki's financial planner. Isaacson testified at trial that during the meeting, Kosobucki knew who Isaacson was, joked around with him, and had no problems tracking the conversation and understanding the documents presented to

6

him and the questions being asked of him. Kosobucki executed the amended trust documents, which specifically disinherited Gordon and provided that the remainder of the trust estate would be divided into four equal shares, with one each going to John, Marlene, and Karl, and one going to Dennis and his children.[2] On appeal, Gordon, Dennis, and Karl assert—and John and Marlene do not dispute—that as a result of the December 2014 changes to the Trust, John was entitled to receive over $470,000 at Kosobucki's death, whereas prior to December 2014 he was entitled to only $25,000.

¶18    In December 2014, Kosobucki's theft allegations against Gordon were reported to the police. Gordon was ultimately charged with three Class H felonies as a result of Kosobucki's allegations. However, those charges were later dismissed at Gordon's preliminary hearing for lack of probable cause. Following the dismissal, the police continued their investigation of the matter.

¶19    During 2015, Kosobucki made various changes to the beneficiary designations on certain life insurance policies and annuities. On January 10, 2015, he changed the beneficiaries on a Northwestern Mutual life insurance policy from Gordon, Dennis, Karl, and Marlene to Karl, Marlene, and John. On April 17, 2015, he changed the beneficiaries on the same policy to John, Marlene, and John's wife. Also on April 17, 2015, Kosobucki executed a change of beneficiary form that named John's three children as the beneficiaries of a Prudential life insurance policy. On the same date, Kosobucki also designated John and Marlene as the beneficiaries of two Allstate annuities. Finally, in August 2015, Kosobucki

---

[2] Kosobucki amended the Trust again in August 2015. That amendment provided that the remainder of the trust estate would be divided into four equal shares, with one each going to John and Marlene, one to Dennis's wife and children, and one to Karl's wife and children.

designated John's three children as the beneficiaries of an annuity from New York Life.

¶20    Kosobucki died in December 2015.  In June 2016, Gordon filed the instant lawsuit, asserting that John and Marlene had defamed him by making false statements about him to police, to the district attorney's office, and to the circuit court during the restraining order hearing.  Gordon also asserted an undue influence claim against John and Marlene, alleging that in December 2014, they "began a campaign to convince [Kosobucki] that Gordon … had been taking advantage of him and stealing from his estate, despite such claims being blatantly false."  Gordon alleged that, through those actions, John and Marlene unduly influenced Kosobucki to change his estate plan.  Gordon later filed an amended summons and complaint, which added Dennis and Karl as plaintiffs for purposes of the undue influence claim. John and Marlene, in turn, asserted a counterclaim against Gordon for theft.

¶21    Gordon demanded a jury trial on all of the claims asserted in his original complaint.  Gordon, Dennis, and Karl again demanded a jury trial in their first and second amended complaints.  None of John and Marlene's answers to the various complaints objected to Gordon, Dennis, and Karl's jury trial demands.

¶22    A final pretrial conference was scheduled for December 11, 2017.  On December 7, John and Marlene filed a motion to strike the jury as to Gordon, Dennis, and Karl's undue influence claim and to instead hold a bench trial on that claim.  In response, Gordon, Dennis, and Karl argued John and Marlene had waived their objection to a jury trial on the undue influence claim by failing to raise that objection in their answers, and that they were entitled to a jury trial on their undue influence claim.  The circuit court apparently agreed with John and Marlene and

8

concluded that Gordon, Dennis, and Karl's undue influence claim should be decided by the court, rather than by a jury.

¶23 A jury trial on the parties' other claims was ultimately held in October 2018. The jury found that Gordon did not steal assets from Kosobucki. It also found that John and Marlene had defamed Gordon, and that Marlene did so maliciously. It further found that, in making the defamatory statements, John and Marlene abused the family member well-being privilege. The jury awarded Gordon a total of $625,000 in damages on his defamation claim.

¶24 John and Marlene filed a postverdict motion asserting there was insufficient evidence to support the jury's finding that they had abused the family member well-being privilege. In the alternative, John and Marlene argued the jury's award of $625,000 in damages was excessive, and the circuit court should therefore "reduce the damages to a total amount of $10,000 or less." The court denied John and Marlene's postverdict motions. Based on the evidence introduced during the jury trial, the court also determined that Gordon, Dennis, and Karl had failed to prove their undue influence claim, using the four-element test for undue influence.

¶25 The circuit court subsequently entered separate, written judgments against John and Marlene. John and Marlene now appeal, arguing the court erred by denying their postverdict motions. Gordon, Dennis, and Karl cross-appeal, arguing that the court erred by rejecting their undue influence claim and that they

were entitled to have the jury determine whether John and Marlene unduly influenced Kosobucki.[3]

## DISCUSSION

### I. John and Marlene's appeal

#### A. Sufficiency of the evidence regarding privilege

¶26    We first address John and Marlene's argument that the circuit court should have granted their postverdict motion challenging the sufficiency of the evidence to support the jury's finding that they abused the family member well-being privilege.  "Any party may move the court to change an answer in the verdict on the ground of insufficiency of the evidence to sustain the answer."  WIS. STAT. § 805.14(5)(c).  A court may not grant such a motion unless it is satisfied that, "considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party."  Section 805.14(1).

¶27    When reviewing a circuit court's decision on a motion to change the jury's answer, we search for credible evidence to sustain the jury's verdict, and we will not overturn the circuit court's decision unless the court was "clearly wrong."

---

[3] Before proceeding with our analysis of the parties' appellate arguments, we pause to observe that Gordon, Dennis, and Karl's combined brief is rife with factual assertions that are unsupported by citations to the appellate record, in violation of WIS. STAT. RULE 809.19(1)(d) and (e) (2017-18).  Gordon, Dennis, and Karl's failure to provide appropriate record citations has hindered our review of the issues raised in this appeal and cross-appeal.  In fact, we considered striking Gordon, Dennis, and Karl's combined brief and requiring them to file a replacement brief that included appropriate record citations.  Although we did not do so, we admonish counsel for Gordon, Dennis, and Karl that future violations of the Rules of Appellate Procedure may result in sanctions.  *See* WIS. STAT. RULE 809.83(2) (2017-18).

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

*Best Price Plumbing, Inc. v. Erie Ins. Exch.*, 2012 WI 44, ¶44, 340 Wis. 2d 307, 814 N.W.2d 419. When there is any credible evidence to support a jury's verdict, the verdict must stand, even if there is also contradictory evidence that is stronger and more convincing. *Id.*

¶28 Here, John and Marlene challenge the sufficiency of the evidence to support the jury's verdict on Gordon's defamation claim. To prevail on a common law defamation claim, a plaintiff must prove the following elements:

> (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the one defamed; and (3) the communication is unprivileged and tends to harm one's reputation, lowering him or her in the estimation of the community or deterring third persons from associating or dealing with him or her.

*Ladd v. Uecker*, 2010 WI App 28, ¶8, 323 Wis. 2d 798, 780 N.W.2d 216. On appeal, John and Marlene do not dispute that they communicated false statements about Gordon to third parties. They argue, however, that Gordon failed to establish that their statements were unprivileged.

¶29 Specifically, John and Marlene contend that their statements about Gordon fell within the family member well-being privilege. The Restatement (Second) of Torts[4] describes the family member well-being privilege as follows:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
> (a) there is information that affects the well-being of a member of the immediate family of the publisher, and

---

[4] The family member well-being privilege is a conditional privilege. In the area of conditional privilege, our supreme court has "endorsed the language of the Restatement of Torts." *Zinda v. Louisiana Pac. Corp.*, 149 Wis. 2d 913, 922, 440 N.W.2d 548 (1989).

>      (b) the recipient's knowledge of the defamatory matter will
>      be of service in the lawful protection of the well-being of the
>      member of the family.

RESTATEMENT (SECOND) OF TORTS § 597(1) (AM. LAW INST. 1977).  A person may not avail him- or herself of the family member well-being privilege if he or she abused the privilege.  *Id.*, cmt. a.  Here, it is undisputed that the privilege would generally apply to John and Marlene's statements unless there was evidence from which a reasonable fact finder could conclude that John and Marlene abused the privilege.[5]

¶30     The jury was instructed that John and Marlene abused the family member well-being privilege if "at the time of making the statements [they] knew that such statements were false or made them in reckless disregard as to the truth or falsity of them."  The jury was further instructed:

>      To find that [John or Marlene] acted with reckless disregard
>      of the truth or falsity of the statement, you must determine
>      that they had serious doubts as to the truth of the statement
>      or had a high degree of awareness that the statement was
>      probably false.
>
>      Reckless conduct is not measured by whether a reasonably
>      prudent person would have made the statements or would
>      have investigated the facts more thoroughly before making

---

[5] Our analysis of the family member well-being privilege has been hampered significantly by the parties' failure to identify the specific defamatory statements that John and Marlene made and by their failure to analyze whether John and Marlene abused the privilege with respect to each individual statement.  Instead of doing so, Gordon generally asserts that John and Marlene defamed him by telling law enforcement and others that he had stolen from Kosobucki, and he then argues that those statements, in general, constituted an abuse of the family member well-being privilege.  John and Marlene, for their part, do not dispute that they made defamatory statements, but they neither identify the statements at issue nor specifically analyze those statements in the context of their argument that they did not abuse the privilege.

The Wisconsin Court of Appeals is a fast-paced, high-volume court.  *State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992).  We cannot serve as both advocate and judge by developing arguments on behalf of the parties.  *Id.*  In this case, we have done our best to address the issues raised on appeal within the context of the parties' often deficient arguments.

them. It is not enough to show that [John or Marlene] made the statement from feelings of ill will or a desire to injure [Gordon]. There must be sufficient evidence to permit the conclusion that [John or Marlene] in fact entertained serious doubts as to the truth of the statements made. Making a statement with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

In the course of your deliberations, you need not accept as conclusive [John or Marlene's] testimony that they believed the statements to be true or had no serious doubt as to the truth of the statements. You may consider such factors as whether there were obvious reasons for [John or Marlene] to doubt the veracity of the information or whether the statement is so inherently improbable that only a reckless person would have made it.

¶31 John and Marlene contend Gordon failed to prove that they abused the family member well-being privilege because he did not establish that they knowingly made false statements about him to third parties or made the statements with reckless disregard for their truth or falsity. John and Marlene testified at trial that they believed Kosobucki when he said that Gordon stole Kosobucki's assets, and they argue there were no "obvious reasons" for them to doubt Kosobucki's accusations. They further argue that, under Wisconsin law (as stated in the jury instruction quoted above), they cannot be faulted for failing to conduct a more thorough investigation before publishing Kosobucki's accusations to third parties.

¶32 We conclude the evidence at trial was sufficient for the jury to conclude there were "obvious reasons" for John and Marlene to doubt the veracity of Kosobucki's accusations against Gordon, such that John and Marlene either had serious doubts as to the truth of the statements or had a high degree of awareness that the statements were probably false. For instance, Gordon testified regarding a meeting in his father's room at Stoney River on December 20, 2014, at which both John and Marlene were present. According to Gordon, during that meeting, he asked Kosobucki whether he remembered offering to pay off Gordon's mortgage,

13

and Kosobucki responded, "[Y]es, I do." Gordon further testified, "As soon as he said that, Marlene … said no, no, no, Dad, that's not what you wanted, you only wanted to make a monthly payment because he was behind on his mortgage." Gordon's testimony in this regard was not inherently incredible, and the jury was therefore entitled to accept his testimony as true. *See Jezeski v. Jezeski*, 2009 WI App 8, ¶8, 316 Wis. 2d 178, 763 N.W.2d 176 (2008). Based on Gordon's testimony, the jury could have concluded there were "obvious reasons" for John and Marlene to doubt the truth of any statements they made after the December 20, 2014 meeting that Gordon had stolen money from Kosobucki in order to pay off Gordon's mortgage.

¶33    The evidence at trial also showed that, in a letter to law enforcement dated February 7, 2015, John stated Gordon had testified under oath during the restraining order hearing that "he did forge his father's signature to many checks." The trial evidence revealed, however, that Gordon did not admit "forging" his father's signature on checks during the restraining order hearing. Instead, Gordon testified during that hearing that he sometimes signed Kosobucki's name to checks *with Kosobucki's authorization*, such that those signatures were not forgeries. As John was present at the restraining order hearing, the jury could reasonably infer that he should have had serious doubts about the veracity of his statement that Gordon had admitted to forging Kosobucki's signature while testifying under oath.

¶34    In addition, there was testimony at trial about Kosobucki cashing out a certificate of deposit (CD), the funds from which were then used to pay off Gordon's mortgage. In his February 7, 2015 letter to law enforcement, John stated Gordon had cashed out that CD "without [Kosobucki's] knowledge or consent." At trial, however, John conceded that he and Marlene had access to the "opening CD paperwork," which stated that "in order to close [the CD] out or cash it out, it had

to be signed for" by Kosobucki. Based on that paperwork, John admitted that Kosobucki must have been mistaken when he stated the CD had been cashed out without his knowledge or consent. John also admitted at trial that he had seen the CD paperwork before he wrote the February 7 letter to law enforcement. Based on John's testimony, the jury could have determined that there were obvious reasons for John to doubt the truth of his statement in that letter that Gordon had cashed out the CD without Kosobucki's knowledge or consent.

¶35 The jury also heard testimony about Kosobucki's health and mental capacity at the time the CD was cashed out. Specifically, Linda Esker, an employee at Kosobucki's bank, testified that in August 2014, she received a call from Gordon, who stated Kosobucki wanted to transfer the funds from the CD into his checking account. Esker informed Gordon that she needed to speak to Kosobucki. At that point:

> [Kosobucki] came on the line, and I said to him, [Kosobucki], Gordon says you want to put this into your checking account, is that what you want to do? And [Kosobucki] said, yes, we have some things we need to take care of. I said, so then that's what you want me to do? I always ask twice, everybody.

Kosobucki again stated that he wanted to cash out the CD. Esker testified she could tell that she was speaking to Kosobucki because he had a "very distinctive way of talking." She also testified that there was nothing unusual about Kosobucki's voice, that he did not sound weak or upset, and that he was "joking back and forth" with her.

¶36 In contrast, Esker testified Kosobucki sounded different during a subsequent phone call in December 2014, after he had been admitted to Stoney River. Esker explained that Marlene came into the bank in December 2014 seeking

copies of Kosobucki's account records. Esker was not allowed to give Marlene information about Kosobucki's account without his approval, so Marlene "called [Stoney River] and they put [Kosobucki] on the line." When Esker asked Kosobucki how he was doing, he responded he was "not doing so good." Esker then asked whether she could provide Kosobucki's banking records to Marlene, and he responded, "I suppose." Esker testified, "So I asked again, I said … do you want me to give her the records of your banking? And he said, yes. He said, I'm not sure what's all going on here." When asked whether Kosobucki's voice sounded the same as it usually did during that phone call, Esker responded, "No, it sounded like an ailing old person. He—cognitively he was probably—I mean, he understood what I was asking of him, I think he—he didn't understand why it was necessary to get records."

¶37 Admittedly, there was no evidence at trial that John and Marlene were aware of Esker's opinion regarding the change in Kosobucki's condition between the August 2014 and December 2014 phone calls described above. Nevertheless, the jury could have reasonably inferred that if Esker—who merely had a professional relationship with Kosobucki—had noticed a marked change in his condition, then John and Marlene—his own children—would also (or should also) have been aware of that change.

¶38 The evidence at trial also showed that Kosobucki took inconsistent positions regarding his feelings about Gordon during the relevant time period. For instance, a note prepared by a Stoney River nurse on December 18, 2014, states that Kosobucki "was alert and oriented with short periods of confusion, variable today, one minute requesting the presence of his son, the next, requesting that he not come to visit." A social worker's note from the same day states Kosobucki told the social worker that "Gordon has control over all of his assets and he doesn't know what is

happening to them." Kosobucki also told the social worker that Gordon would not handle it well if he found out that Kosobucki had taken him off of his bank account, and Kosobucki therefore requested that the social worker call adult protective services on his behalf. However, when Kosobucki subsequently spoke to a police detective about the accusations against Gordon, he did not state that he felt intimidated by Gordon, and he instead indicated that "he was happy that Gordon was spending time with him."

¶39     Once again, it appears there is no direct evidence that John and Marlene were specifically aware of Kosobucki's contradictory statements about Gordon to Stoney River staff and to law enforcement. Yet, as above, we conclude the trial evidence regarding those statements provided a basis for the jury to reasonably infer that John and Marlene would have heard similar inconsistent statements during their time with Kosobucki.

¶40     The above evidence—as well as evidence showing that the transactions in question were not hidden, and the fact that Kosobucki's signature appeared on the relevant checks—provided an ample basis for the jury to conclude there were "obvious reasons" for John and Marlene to doubt the veracity of the statements they made about Gordon stealing Kosobucki's assets. As such, the jury could find that John and Marlene made the statements despite having "serious doubts" regarding their truth. The fact that other evidence in the record may have supported a contrary conclusion is immaterial. "When more than one reasonable inference can be drawn from the credible evidence, the reviewing court must accept the inference drawn by the trier of fact." *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979). Here, credible evidence supports the jury's finding that John and Marlene abused the family member well-being privilege because they had "serious doubts" regarding the truth of their statements about

17

Gordon, and they therefore acted in reckless disregard of the statements' truth or falsity.[6]

¶41    We conclude our discussion of this issue by noting that we do not dispute that this type of scenario—i.e., one in which an elderly parent reports to some of his children that another child has stolen his assets—is, in general, the type of situation that should be reported to police. That is precisely why the circuit court concluded that the family member well-being privilege applied to John and Marlene's statements in the first instance.

¶42    The jury was instructed, however, that it needed to determine whether John and Marlene had abused the privilege. The jury determined they had. For all of the reasons set forth above, and taking into account our deferential standard of review, we conclude there was sufficient evidence to support the jury's determination in that regard. Notably, the jury could have concluded that even if John and Marlene's initial report to police was not an abuse of the privilege, they should have had serious doubts about subsequent statements they made after

---

[6] John and Marlene make much of the fact that, when denying their postverdict motion challenging the sufficiency of the evidence to support the jury's finding that they abused the family member well-being privilege, the circuit court reasoned there was evidence that they abused the privilege by "excessively and unnecessarily publish[ing]" their defamatory statements after Kosobucki had been "isolated from Gordon and Gordon was precluded from involvement in his father's financial affairs." In other words, the court concluded John and Marlene abused the privilege by continuing to publish the statements after it was no longer reasonable for them to believe that doing so would be of service in the lawful protection of Kosobucki's well-being.

The jury was not instructed, however, that such excessive publication could constitute an abuse of the family member well-being privilege. In addition, whether John and Marlene reasonably believed that their statements would be of service in protecting Kosobucki's well-being appears to go to whether the family member well-being privilege applied in the first instance, not to whether it was abused. *See* RESTATEMENT (SECOND) OF TORTS § 597(1) (AM. LAW INST. 1977). In any event, regardless of whether the circuit court employed the correct analysis, for the reasons explained above, we conclude the evidence was sufficient to support the jury's finding that John and Marlene abused the privilege.

18

becoming aware of additional information that called into question Kosobucki's allegations. Under these circumstances, the circuit court's refusal to change the jury's answers regarding abuse of the privilege was not "clearly wrong." *See Best Price Plumbing*, 340 Wis. 2d 307, ¶44.

### B. Reduction of the jury's damages award

¶43 John and Marlene also argue that, even if there were sufficient evidence to support the jury's finding that they abused the family member well-being privilege, the jury's award of $625,000 in damages was excessive, and the circuit court therefore erred by denying their motion to reduce that award. If a circuit court decides that the damages awarded by a jury are excessive, "the court shall determine the amount which as a matter of law is reasonable and shall order a new trial on … damages," unless the plaintiff accepts the judgment in the changed amount within ten days. WIS. STAT. § 805.15(6).

¶44 An award of damages is excessive under WIS. STAT. § 805.15(6) when it "reflects injuries not proved or 'a rate of compensation beyond reason.'" *Staskal v. Symons Corp.*, 2005 WI App 216, ¶38, 287 Wis. 2d 511, 706 N.W.2d 311 (citation omitted). When considering a motion to reduce a damages award under § 805.15(6), a circuit court must view the evidence in the light most favorable to the jury's verdict. *Staskal*, 287 Wis. 2d 511, ¶39. Thus, the court must affirm the award "if there is any credible evidence under any reasonable view that supports the jury's finding on the amount of damages." *Id.* On appeal, "we view the jury's verdict 'with particular favor' where, as here, the circuit court has analyzed the evidence in reaching its decision." *Id.*, ¶40 (citation omitted).

¶45 In its decision denying John and Marlene's motion to reduce the jury's damages award, the circuit court reasoned:

> The jury was presented evidence Gordon was enjoined from seeing or speaking to his father with whom he had a close relationship up to December of 2014, which meant knowing his father went to his grave despising him. Gordon knew his children, brothers, except [John], and their spouses were likewise excluded from his father's life. Those things do cause humiliation, mental anguish and damage to reputation which are properly compensable.

> A CCAP[7] entry, despite the disclaimer, is detrimental to one's reputation. Also, the jury could find the ongoing consequences as a result of the false statements. Many of Gordon's losses were irreversible, and considering the damages the jury could consider, Gordon needlessly lost a year with his father. Many would consider a lost year with a parent as priceless.

¶46    On appeal, John and Marlene concede that $625,000 may "be appropriate compensation for Gordon's emotional wounds," as described by the circuit court. They argue, however, that "none of those wounds—and thus none of the resulting damages—were caused by John or Marlene." (Emphasis omitted.) Instead, John and Marlene argue that Gordon's damages were "caused entirely by [Kosobucki]," who "decided Gordon stole from him," "who convinced a judge to grant [a] restraining order [against Gordon]," and "who told administrators at his assisted-living facility that Gordon was not to be allowed in."

¶47    Considering the evidence in the light most favorable to the jury's verdict, we cannot say that there is no credible evidence to support the jury's award of $625,000 in damages. John and Marlene do not dispute that there was sufficient evidence for the jury to find that they made defamatory statements about Gordon to

---

[7] CCAP is an acronym for Wisconsin's Consolidated Court Automation Programs, which maintains a website that provides information about circuit court cases entered by court staff. *See Kirk v. Credit Acceptance Corp.*, 2013 WI App 32, ¶5 n.1, 346 Wis. 2d 635, 829 N.W.2d 522. The circuit court here was presumably referring to the CCAP entry regarding the criminal charges against Gordon.

20

various third parties. Moreover, John and Marlene did not merely tell third parties that Kosobucki thought Gordon had stolen his assets; instead, they affirmatively stated that Gordon had, in fact, stolen those assets. The jury could reasonably infer that the criminal charges that were filed against Gordon were due, at least in part, to John and Marlene's statements. When asked how going through the criminal process made him feel, Gordon responded, "Humiliated. My name, my reputation had been totally smeared, dragged through the mud. It's just not a good experience to have to go through." He further testified that people he knew began to "look[] at [him] a little differently" after the charges were filed. Although the charges against Gordon were ultimately dismissed, John and Marlene do not dispute the circuit court's assertion that a CCAP entry pertaining to criminal charges is detrimental to one's reputation, even if the charges were later dismissed.

¶48 Moreover, the jury could also reasonably infer that John and Marlene aggravated the situation and actively encouraged Kosobucki's belief that Gordon stole his assets.[8] There was evidence at trial that after Kosobucki was admitted to Stoney River, he was somewhat confused and was intermittently asking for Gordon. The evidence also showed that Kosobucki only began accusing Gordon of stealing from him after Marlene first visited him at Stoney River on December 18, 2014. In addition, as noted above, Gordon testified that during a family meeting on December 20, 2014—at which both John and Marlene were present—Kosobucki initially stated that he remembered offering to pay off Gordon's mortgage, but Marlene then interjected, telling Kosobucki that he had only wanted to make one monthly payment. Based on this and other evidence introduced at trial, the jury could reasonably infer that John and Marlene did more than simply repeat

---

[8] In fact, the jury found that Marlene made her defamatory statements about Gordon with express malice, and it therefore awarded punitive damages against her.

accusations that Kosobucki had made against Gordon. Instead, the jury could reasonably infer that John and Marlene instigated, or at least promoted, Kosobucki's belief that Gordon had stolen from him.[9]

¶49     For the reasons explained above, we conclude the record contains credible evidence to support the jury's award of $625,000 in damages on Gordon's defamation claim. As such, the circuit court did not err by denying John and Marlene's motion to reduce the amount of that award.

## II. Gordon, Dennis, and Karl's cross-appeal

### A. Undue influence claim

¶50     In their cross-appeal, Gordon, Dennis, and Karl first argue that the circuit court erred by concluding they had failed to prove their undue influence claim against John and Marlene. In the main, their argument on this point challenges the circuit court's factual findings.

¶51     When reviewing a circuit court's decision following a bench trial, we must accept the circuit court's findings of fact unless they are clearly erroneous. WIS. STAT. § 805.17(2). A finding of fact is clearly erroneous when it is against the great weight and clear preponderance of the evidence. *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615. "Therefore, although evidence may have presented competing factual inferences, the circuit

---

[9] As discussed in greater detail below, the circuit court concluded Gordon, Dennis, and Karl did not meet their burden to show that John and Marlene unduly influenced Kosobucki to change his estate plan in December 2014. Nonetheless, based on the evidence presented at trial, the jury could reasonably find that John and Marlene's actions contributed to or supported Kosobucki's theft allegations against Gordon.

court's findings are to be sustained if they do not go 'against the great weight and clear preponderance of the evidence.'" *Id.* (citation omitted). In addition, "[w]hen the circuit court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and the weight to be given to each witness's testimony." *State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345.

¶52    Wisconsin courts recognize two distinct methods by which a litigant may establish undue influence: a four-element test and a two-element test. *Hoeft v. Friedli*, 164 Wis. 2d 178, 184-85, 473 N.W.2d 604 (Ct. App. 1991). In this case, the circuit court determined that the four-element test applied. Under that test, a litigant must prove: "(1) susceptibility to undue influence, (2) opportunity to influence, (3) disposition to influence, and (4) [a] coveted result." *Id.* at 185. When a litigant has established any three of these four elements by clear and convincing evidence, only slight evidence of the remaining element is required. *Id.*

¶53    Here, the circuit court concluded Gordon, Dennis, and Karl had failed to meet their burden with respect to the first and third elements of the four-element test.[10] In order to prove the first element—i.e., susceptibility to undue influence—Gordon, Dennis, and Karl had to establish that Kosobucki was "unusually receptive to the suggestions of others and consistently deferred to them on matters of utmost

---

[10] The circuit court concluded John and Marlene had conceded the existence of the second element—i.e., the opportunity to influence. The court made several factual findings related to the fourth element—i.e., a coveted result—but it did not specifically determine whether Gordon, Dennis, and Karl had established that element. On appeal, Gordon, Dennis, and Karl argue the evidence supports a determination that they established the fourth element. We need not address that argument, however, as we affirm the circuit court's determinations that Gordon, Dennis, and Karl failed to establish the first and third elements of the four-element test.

personal importance."[11]  *See **Johnson v. Merta***, 95 Wis. 2d 141, 156-57, 289 N.W.2d 813 (1980).

¶54    The circuit court cited the following evidence in support of its finding that Kosobucki was not susceptible to undue influence: (1) Kosobucki met with Eckert—his estate planning attorney—two times during December 2014, and Eckert testified he had no concerns about undue influence; (2) attorney Steve Robinson—Kosobucki's guardian ad litem during the restraining order proceedings—"indicated no concerns about [Kosobucki's] mental acuity"; (3) Isaacson—Kosobucki's financial planner—"indicated no concerns about [Kosobucki's] mental health after witnessing [Kosobucki] make changes to his trust and power of attorney documents"; (4) the director of the assisted living facility where Kosobucki spent the final year of his life, and the medical staff at that facility, "reported no concerns about [Kosobucki's] mental health"; (5) John and Marlene testified they had no concerns about Kosobucki's mental health; and (6) for the past two decades, Kosobucki had "a history of changing his estate plan" based upon which of his children were in or out of his favor at the time, and the changes to his estate plan during the last year of his life were consistent with that practice.  This evidence amply supports the court's finding that Kosobucki was not susceptible to undue influence at the time he made the relevant changes to his estate plan.  As such, the court's finding is not clearly erroneous.

¶55    Gordon, Dennis, and Karl argue the circuit court erred by finding that Kosobucki was not susceptible to undue influence because the court "ignored the

---

[11] On appeal, Gordon, Dennis, and Karl assert that John and Marlene "conceded" the first element in their second amended answer.  However, in support of that assertion, Gordon, Dennis, and Karl cite an allegation in John and Marlene's *counterclaim*, not their second amended answer.  To the contrary, in their second amended answer, John and Marlene expressly denied Gordon, Dennis, and Karl's allegation that Kosobucki was susceptible to undue influence.

compelling nature" of testimony provided by their expert witness, geriatric psychiatrist Sanford Finkel. Based on his review of Kosobucki's medical records, Finkel opined that Kosobucki was susceptible to undue influence when he changed his estate plan in December 2014. The court did not, however, "ignore" Finkel's testimony. Instead, the court expressly noted that it did not find Finkel's testimony persuasive because Finkel merely reviewed Kosobucki's medical records and "never personally met [Kosobucki]." In contrast, the court observed that "[m]ultiple individuals had contact with [Kosobucki] and did not note any concerns" about his susceptibility to undue influence. The court found that Finkel's testimony was "insufficient to overcome those in-person observations." Again, when the circuit court acts as the finder of fact, it is the ultimate arbiter of the witnesses' credibility and of the weight to be given to their testimony. *Peppertree Resort Villas*, 257 Wis. 2d 421, ¶19.

¶56 Gordon, Dennis, and Karl also cite several other pieces of evidence in support of their argument that Kosobucki was susceptible to undue influence. We agree with John and Marlene, however, that Gordon, Dennis, and Karl's attempt to "cherry-pick" pieces of evidence that support their position is unavailing. As noted above, even where the evidence presents competing factual inferences, we must accept the inferences drawn by the circuit court as long as they do not go against the great weight and clear preponderance of the evidence. *Phelps*, 319 Wis. 2d 1, ¶39. We cannot conclude that is the case here, given the substantial evidence the circuit court cited in support of its determination that Kosobucki was not susceptible to undue influence.

¶57 The circuit court also determined that Gordon, Dennis, and Karl had failed to prove the third element of the four-element test for undue influence—i.e., that John and Marlene had a disposition to influence. A disposition to influence

25

"means more than a desire to obtain a share of the estate." ***Johnson***, 95 Wis. 2d at 159 (citation omitted). Instead, "it implies grasping and overreaching, and a willingness to do something wrong or unfair." ***Id.*** (citation omitted).

¶58 When discussing the third element of the four-element test, the circuit court stated it could not find "by clear and convincing evidence that either [John] or Marlene possessed the requisite disposition to predispose them to undue influence." The court stated Gordon, Dennis, and Karl had "failed to demonstrate that either John or Marlene are dishonest people with the willingness to do something wrong or unfair and that they have grasping or overreaching characteristics." The court also noted that John "had a lengthy career in law enforcement."

¶59 Gordon, Dennis, and Karl argue the circuit court erred because the jury's finding that John and Marlene defamed him shows that John and Marlene were willing to do something wrong and unfair and therefore gives rise to issue preclusion with respect to their disposition to unduly influence Kosobucki. This argument is wholly undeveloped. Gordon, Dennis, and Karl do not recite the legal standard for the application of issue preclusion or explain how the facts of this case fulfill that standard. Moreover, they do not address the fact that defamation and undue influence are separate causes of action with distinct elements. We need not address undeveloped arguments. *See **State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

¶60 Gordon, Dennis, and Karl also argue that John and Marlene demonstrated their willingness to do something wrong or unfair by "ensuring that any family members who would question what happened were prevented from ever seeing [Kosobucki]." The circuit court was not required, however, to accept Gordon, Dennis, and Karl's theory that John and Marlene were responsible for

isolating their father from other family members. Instead, based on the evidence introduced at trial, the court could reasonably find that it was Kosobucki himself who decided that he no longer wanted to have contact with Gordon, Dennis, and Karl.

¶61 Gordon, Dennis, and Karl also argue that changes to the beneficiary designations on Kosobucki's life insurance policies and annuities show that John and Marlene were willing to do something wrong or unfair. In support of this argument, they claim there is "no question that in the absence of [John and Marlene's] involvement none of the life insurance beneficiary designations would have changed." They do not, however, provide any record citations in support of that assertion. We need not consider factual allegations that are unsupported by citations to the appellate record. *See* ***Tam v. Luk***, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990). Moreover, Gordon, Dennis, and Karl's argument that John and Marlene were solely responsible for the changed beneficiary designations is contrary to the circuit court's finding that Kosobucki regularly made changes to his estate plan based on which of his children were in his favor.

¶62 Gordon, Dennis, and Karl next argue that "numerous witnesses" testified at trial regarding Kosobucki's "numerous open proclamations of gratitude for Gordon's care for him and admiration toward the closeness of their relationship," but "there was not a single witness who testified that [Kosobucki] had ever spoken admirably about [John or his wife]." They do not explain, however, why these alleged facts are relevant to a determination of whether John and Marlene had a disposition to unduly influence Kosobucki. Again, we need not address undeveloped arguments. *See* ***Pettit***, 171 Wis. 2d at 646-47.

27

¶63 Gordon, Dennis, and Karl also assert that the circuit court "mixed up dishonesty as a factor rather than the actual factors of the willingness to do something wrong or unfair." We are not persuaded that the court's use of the word "dishonesty" shows that the court applied an incorrect legal standard when assessing whether John and Marlene had a disposition to unduly influence Kosobucki. Although the court used the word "dishonesty" in its decision, it also referenced the correct standard—i.e., whether John and Marlene had "the willingness to do something wrong or unfair" and had "grasping or overreaching characteristics."

¶64 For the foregoing reasons, we reject Gordon, Dennis, and Karl's argument that the circuit court erred by finding they did not establish the first and third elements of the four-element test for undue influence. In the alternative, Gordon, Dennis, and Karl argue that the court erred in the first instance by using the four-element test to analyze their undue influence claim, rather than the two-element test. They do not, however, cite any authority in support of that assertion, nor do they explain why they believe the court should have used the two-element test. Once again, we need not address undeveloped arguments. *See **id.***

¶65 Moreover, in response to Gordon, Dennis, and Karl's argument that the circuit court should have used the two-element test, John and Marlene cite *Mielke v. Nordeng*, 114 Wis. 2d 20, 27-28, 337 N.W.2d 462 (Ct. App. 1983), for the proposition that the two-element test "is meant for close, confidential non-family relationships such as those between attorney and client, physician and patient, or priest and parishioner." John and Marlene therefore argue that the two-element test is inapplicable in this case, which involves parent-child relationships. In their reply brief, Gordon, Dennis, and Karl do not respond to John and Marlene's argument that the two-element test is inapplicable here. We therefore deem that point conceded. *See **Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.***, 90 Wis. 2d

97, 109, 279 N.W.2d 493 (Ct. App. 1979). For the reasons explained above, the court properly determined that Gordon, Dennis, and Karl had failed to prove undue influence under the four-element test.

¶66 We recognize that, at first blush, our decision that Gordon, Dennis, and Karl failed to prove their undue influence claim could be viewed as inconsistent with our conclusion that the evidence was sufficient to support the jury's finding that John and Marlene abused the family member well-being privilege. Specifically, the court's finding that Kosobucki was not susceptible to undue influence appears, on its face, somewhat inconsistent with our determination that the evidence at trial regarding Kosobucki's mental capacity provided an obvious reason for John and Marlene to doubt the truth of his allegations against Gordon.

¶67 We note, however, that the jury's and the circuit court's decisions are not inherently inconsistent. The circuit court concluded that Kosobucki was not susceptible to influence and that he developed the idea that Gordon stole from him without instigation from John and Marlene. Consistent with that decision, the jury could reasonably have believed that John and Marlene nevertheless abused the family member well-being privilege by continuing to actively encourage Kosobucki's belief that Gordon stole his assets and by communicating that belief to others. The jury could have concluded John and Marlene did so even though there were obvious reasons for them to doubt Kosobucki's allegations, which should have given rise to serious doubts about the truth of those allegations.

¶68 In any event, any apparent inconsistency between the jury's and the circuit court's decisions is the result of two factors: (1) the fact that different fact finders decided the defamation claim and the undue influence claim; and (2) the deferential standards of review that we apply to both fact finders' decisions. At

trial, evidence was presented supporting both sides' respective positions. In assessing the defamation claim, the jury chose to believe the evidence supporting Gordon's position. Conversely, when assessing the undue influence claim, the court chose to believe the evidence supporting John and Marlene's position.

¶69    On appeal, we must uphold the jury's verdict because, as explained above, there is credible evidence in the record to support it. *Best Price Plumbing*, 340 Wis. 2d 307, ¶44. On the other hand, we cannot conclude that the circuit court's findings regarding the undue influence claim are clearly erroneous. *See* WIS. STAT. § 805.17(2). Any perceived inconsistency between the jury's verdict and the court's determination therefore does not provide a basis for us to reverse either fact finder's decision.

### B. Entitlement to a jury trial

¶70    Finally, Gordon, Dennis, and Karl argue that they were entitled to have a jury, rather than the circuit court, determine whether they had proved their undue influence claim. Gordon, Dennis, and Karl observe that they demanded a jury trial on all of the claims stated in their original complaint, as well as in their first and second amended complaints. They also observe that none of John and Marlene's answers objected to their demand for a jury trial on the undue influence claim. John and Marlene did not object to holding a jury trial on that claim until December 7, 2017—less than one week before the scheduled final pretrial conference. Gordon, Dennis, and Karl argue that, by failing to object sooner, John and Marlene waived their right to object to the court holding a jury trial on the undue influence claim. They also argue that, even if John and Marlene did not waive their right to object, the court erred by granting John and Marlene's motion to strike the

jury because Gordon, Dennis, and Karl were entitled to a jury trial on their undue influence claim.

¶71     Whether a party has a right to a jury trial on a particular claim is a question of law that we review independently. *See* ***Harvot v. Solo Cup Co.***, 2009 WI 85, ¶¶31-32, 320 Wis. 2d 1, 768 N.W.2d 176. The law in Wisconsin is well settled that a party does not have a right to a jury trial on an undue influence claim seeking to set aside a will. *See* ***Bermke v. Security First Nat'l Bank of Sheboygan***, 48 Wis. 2d 17, 22, 179 N.W.2d 881 (1970). In this case, however, Gordon, Dennis, and Karl's undue influence claim sought to set aside changes Kosobucki made to the Trust, as well as changes he made to the beneficiary designations on certain life insurance policies and annuities.

¶72     As John and Marlene concede, no published Wisconsin case has directly addressed "whether a party has a right to a jury in undue influence claims involving trusts or insurance policies." They observe, however, that courts in other jurisdictions "have specifically held that undue influence claims for non-will transfers are subject to the same set of rules: They are all equitable claims for which there is no right to a jury trial."

¶73     For instance, in ***McClamroch v. McClamroch***, 476 N.E.2d 514, 516-17 (Ind. Ct. App. 1985), the decedent's surviving children and two grandchildren sought to set aside a deed executed by the decedent in favor of himself and his second wife on the grounds that it was the result of undue influence. The trial court rejected the plaintiffs' undue influence claim. *Id.* at 520. On appeal, the plaintiffs argued the trial court had erred by refusing to empanel an advisory jury. *Id.* at 519. The Indiana Court of Appeals disagreed, noting that "a suit to set aside

a deed is submitted to the equitable jurisdiction of the trial court" and "[t]here is no constitutional right to a jury trial in suits involving equitable considerations." *Id.*

¶74 We agree with John and Marlene that Gordon, Dennis, and Karl had no right to a jury trial on their undue influence claim. An action seeking to set aside a transaction on the basis of undue influence is equitable in nature. *See, e.g.*, *Kuehn v. Kuehn*, 11 Wis. 2d 15, 17-18, 30, 104 N.W.2d 138 (1960); *Marking v. Marking*, 106 Wis. 292, 293, 82 N.W. 133 (1900); *Doyle v. Welch*, 100 Wis. 24, 24, 75 N.W. 400 (1898). In Wisconsin, a party has no right to a jury trial in an equitable action. *See Zabel v. Zabel*, 210 Wis. 2d 336, 344, 565 N.W.2d 240 (Ct. App. 1997). As such, Gordon, Dennis, and Karl had no right to a jury trial on their undue influence claim against John and Marlene.

¶75 Gordon, Dennis, and Karl suggest that they were entitled to a jury trial because they timely demanded a jury trial under WIS. STAT. § 805.01(2). We are not persuaded. Section 805.01(2) provides: "Any party *entitled to a trial by jury* or by the court may demand a trial in the mode to which entitled at or before the scheduling conference or pretrial conference, whichever is held first." (Emphasis added.) Here, for the reasons explained above, Gordon, Dennis, and Karl were not "entitled to a trial by jury" on their undue influence claim. Accordingly, nothing in § 805.01(2) required the circuit court to hold a jury trial on that claim, regardless of the timeliness of their request.

¶76 Gordon, Dennis, and Karl also argue that they were entitled to a jury trial because their undue influence claim sought, in part, to set aside changes Kosobucki made to beneficiary designations on his life insurance policies and annuities. They assert that, had they succeeded on their undue influence claim, they would have been entitled to "recover the monies paid out" under those policies and

annuities. We do not agree that Gordon, Dennis, and Karl's possible recovery of funds paid out under Kosobucki's life insurance policies and annuities converts their equitable claim for undue influence into a claim for money damages, for which a jury trial would have been required. In *Kuehn*, the plaintiff sought to recover proceeds from government bonds, promissory notes, and a savings account, and his undue influence claim was nevertheless deemed to be an equitable action. *See Kuehn*, 11 Wis. 2d at 17-18, 30. The same result follows here, where Gordon, Dennis, and Karl sought to recover the proceeds of life insurance policies and annuities.

¶77 We also reject Gordon, Dennis, and Karl's argument that they were entitled to a jury trial on their undue influence claim because John and Marlene waived their right to object to the circuit court holding a jury trial. When a party has not timely objected to a jury trial, a circuit court has "discretion to determine whether a finding of waiver is appropriate." *Sharpley v. Sharpley*, 2002 WI App 201, ¶13, 257 Wis. 2d 152, 653 N.W.2d 124. Gordon, Dennis, and Karl do not acknowledge this discretionary standard of review or attempt to explain why they believe the court erroneously exercised its discretion under the specific facts of this case.

¶78 Instead, Gordon, Dennis, and Karl cite *Wickert v. Burggraf*, 214 Wis. 2d 426, 570 N.W.2d 889 (Ct. App. 1997), in support of their argument that John and Marlene waived their right to object to the circuit court holding a jury trial. In *Wickert*, the plaintiff commenced a tort action against the defendants for intentional interference with an expected inheritance. *Id.* at 428-29. On appeal, the defendants argued that claim should have been tried to the court, rather than a jury. We rejected the defendants' argument, noting that the plaintiff had timely demanded a jury trial, and the defendants first sought to have the case tried to the court on the

33

morning of trial. *Id.* at 432-33. Under those circumstances, we concluded the defendants had waived "[w]hatever right [they] had to demand that this action be tried before a judge and not a jury." *Id.* at 433.

¶79 *Wickert* is distinguishable in two important respects. First, *Wickert* concerned a tort claim. This case, in contrast, concerns an equitable claim for undue influence. As we have already determined, Gordon, Dennis, and Karl had no right to a jury trial on their undue influence claim.

¶80 Second, the defendants in *Wickert* first objected to the case being tried by a jury on the morning of trial. Here, in contrast, John and Marlene objected several days before the final pretrial conference that was scheduled for December 11, 2017. The court did not address their objection during the December 11 hearing. Instead, at the beginning of that hearing, the court informed the parties that the trial—which had been scheduled for January 2018—would need to be postponed based primarily on conflicts in the court's calendar. The parties subsequently filed briefs concerning the jury trial issue, and, ultimately, the trial did not take place until October 2018. We agree with John and Marlene that these circumstances are significantly different from those in *Wickert*, where the defendants did not object to the court holding a jury trial until the morning of trial. Again, Gordon, Dennis, and Karl do not explain why—on the specific facts of this case—the court erroneously exercised its discretion by declining to apply the waiver rule.

¶81 Finally, for the first time in their reply brief, Gordon, Dennis, and Karl argue that the circuit court should have empaneled an advisory jury on their undue influence claim. We need not address arguments raised for the first time in a reply brief. *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d

285 (Ct. App. 1998).  Moreover, Gordon, Dennis, and Karl do not explain why the denial of an advisory jury was an erroneous exercise of discretion, other than to assert that the court "would have been well served to have the jury provide their thoughts on undue influence."  This undeveloped argument does not convince us that the court erroneously exercised its discretion by denying an advisory jury.

*By the Court.*—Judgments affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.