

FILED
Apr 29 2024, 9:06 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court


I N  T H E

# Court of Appeals of Indiana

Emad Abed,

*Appellant-Defendant*

v.

Andrea ElSharif and Surayyah Seif ElSharif, Co-Personal Representatives of the Estate of Seif ElSharif, and Samirah Realty, LLC,

*Appellees-Plaintiffs*

---

April 29, 2024

Court of Appeals Case No.
23A-CT-1486

Appeal from the Lake Superior Court

The Honorable Bruce D. Parent, Special Judge

Trial Court Cause No.
45D11-2105-CT-459

---

**Opinion by Judge Kenworthy**

Chief Judge Altice and Judge Weissmann concur.

**Kenworthy, Judge.**

## Case Summary

Emad Abed appeals the trial court's judgment setting aside quitclaim deeds and other written instruments purportedly executed by his late uncle, Seif ElSharif ("Seif"), to transfer ownership of all Seif's assets to Abed, and ordering Abed to pay Seif's estate over $3 million dollars in damages and attorney fees. On appeal, Abed contends the trial court (1) erred in denying his demand for a jury trial, and (2) abused its discretion in denying his motion for the trial judge to recuse. We affirm.

## Facts and Procedural History

Seif died intestate on September 25, 2019, leaving one adult and two minor daughters as his heirs. Seif's longtime attorney had prepared estate planning documents and delivered them to Seif on June 20, but Seif never executed them. On October 1, Seif's estate was submitted to probate. His ex-wife and mother of his children, Andrea ElSharif ("Andrea"), and oldest daughter, Surayyah ElSharif ("Surayyah"), were appointed co-personal representatives.

Prior to his death, Seif owned personal real estate and held ownership interests in several adult entertainment enterprises in Indiana and Illinois. His assets included all interest in Indiana companies Samirah Realty, LLC and Seif, LLC.

Seif owned a residence on Killarney Drive in Dyer, Indiana ("Killarney residence"), and through Samirah Realty, LLC, he owned commercial real estate on Summer Street in Hammond, Indiana ("Summer Street property") (collectively, "Indiana Real Estate"). Seif also owned a vacant parcel of land on Shannon Bridge Drive ("Shannon Bridge lot").

[4] According to a probate inventory filed in August 2020, Seif's property also included the following assets: (1) stock in four Indiana corporations: MIJ, Inc., Saharah Inc., Surayyah Inc., and Benedict Inc.; (2) a BMO Harris bank account with approximately $54,000 cash; (3) interest in two Indiana limited liability companies: Swan Condos, LLC, and 601 Killarney LLC; (4) interest in two Illinois limited liability companies: SSNN Realty, LLC, and ElSharif, LLC; and (5) interest in Chicago Title Land Trust Number 1113203 (collectively, "Additional Assets"). *Ex. Vol. 6* at 122–24.[1] Most of these entities owned real estate or operated businesses associated with adult entertainment venues in the Chicago region.[2]

[5] On December 5, 2019, the probate court held a hearing to determine ownership of certain bank accounts related to Seif's businesses. Abed attended the probate hearing but made no claim to Seif's assets.

---

[1] The probate inventory also included a right to proceeds from the closing of a real estate sales contract in Lansing, Illinois, but that interest is not at issue in this case.

[2] Throughout this decision, we refer generally to the Indiana Real Estate, Shannon Bridge lot, Seif, LLC membership interest, and Additional Assets as "Seif's assets."

[6] During the estate administration, the estate paid bills associated with Seif's property and businesses as it was able. Scott Wheaton, an attorney and certified public accountant for all Seif's businesses since 2017, advised the personal representatives about certain financial and tax matters related to Seif's assets. The period for making claims against the estate closed on June 25, 2020.[3] Sometime thereafter, the estate sold the Shannon Bridge lot.

[7] Then, in March and April 2021, Abed recorded quitclaim deeds showing Seif (individually or on behalf of Samirah Realty, LLC) transferred ownership of the Indiana Real Estate to Abed in June 2019, prior to Seif's death. In April 2021, Andrea received notice through her attorney in Illinois that Abed was claiming ownership of some of Seif's assets in an Illinois court case. The estate had listed the Killarney residence for sale for $1.59 million but took it off the market after learning the estate was no longer the owner of record.

[8] On May 11, 2021, Andrea and Surayyah, as co-personal representatives of the estate, and Samirah Realty, LLC (collectively, "ElSharif") brought an action in the Lake Superior Court to quiet title to the Indiana Real Estate and for declaratory judgment that the quitclaim deeds Abed recorded were void. ElSharif also sought declaratory judgment regarding the ownership of the Seif, LLC membership interests.

---

[3] *See* Ind. Code § 29-1-7-7(e) (2019) & I.C. § 29-1-14-1 (2001).

In the six-count complaint, ElSharif alleged Abed had created and forged Seif's signature on documents purporting to transfer ownership of the Indiana Real Estate and all interest in Seif, LLC, from Seif to Abed on June 3, 2019. ElSharif attached to the complaint the quitclaim deeds recorded by Abed, which showed Seif allegedly signed the documents on June 3 in front of a notary in Minnesota. ElSharif alleged Seif was in Indiana and Illinois on June 3, the notary's commission had not begun by that date, the notary stamp used was not created until after Seif's death, and Seif did not disclose or discuss any such transfers with his estate planning attorney or business accountant prior to his death. In Counts 4 through 6, ElSharif alleged Abed committed the crime of forgery[4] and sought treble damages, plus attorney fees and expenses, under the Indiana Crime Victims Relief Act ("CVRA").[5]

On September 9, 2021, Abed filed a response, counterclaims, and jury demand. Abed denied generally the allegations of the complaint. In Counterclaim 1, Abed alleged he possessed an unrecorded quitclaim deed giving him ownership of the Shannon Bridge lot. He sought damages arising from its sale. In Counterclaim 2, Abed sought a declaratory judgment that he was the owner of all Seif's assets. Abed attached to the response a May 30, 2019, agreement between Seif and Abed giving Abed the option to purchase Seif's assets and a

---

[4] I.C. § 35-43-5-2 (2016).

[5] Under the CVRA, any person who suffers a pecuniary loss as a result of a violation of Indiana Code Article 35-43 (offenses against property) may recover an amount not to exceed three times the actual damages suffered, plus costs, reasonable attorney fees, and other expenses. *See* I.C. § 34-24-3-1 (2019).

receipt for one dollar consideration for the option. In the response, Abed demanded "trial by jury upon all issues triable to a jury." *Appellant's App. Vol. 2* at 217.

[11] In March 2022, while this action was pending, Abed attempted to exercise control over the Indiana Real Estate by entering the Killarney residence and trying to lease the Summer Street property. ElSharif moved for a temporary restraining order and preliminary injunction prohibiting Abed or anyone acting on his behalf from accessing or interfering with the Indiana Real Estate. Following a hearing, the trial court issued an order barring Abed and "all friends, family members, and confederates" of Abed from entering or holding themselves out as the owner of the properties. *Appellant's App. Vol. 3* at 67. The order also barred either party from listing, selling, or leasing the Indiana Real Estate unless the parties agreed.

[12] ElSharif moved to strike Abed's jury demand arguing the case sounded in equity. ElSharif also moved to amend its complaint to add Count 7, in which it requested a declaratory judgment that any other documents purporting to transfer Seif's assets to Abed were void as forgeries and the estate was the rightful owner. ElSharif alleged Abed forged additional transfer documents on June 3 as part of the same transaction in which Seif purportedly transferred the Indiana Real Estate and Seif, LLC interests to Abed. In Count 7, ElSharif also sought preliminary and permanent injunctions enjoining Abed or any associates from asserting any rights or interests in Seif's assets. The trial court granted both the motion to strike the jury demand and the motion to amend the

complaint. Abed then filed an amended counterclaim, and ElSharif filed an amended answer.

[13] On October 14, 2022, Abed filed a *pro se* motion for the recusal of Judge Bruce Parent arguing the judge expressed "personal bias and prejudice" and could no longer hear the case "in a fair and impartial manner." *Id.* at 112. The trial court denied the motion to recuse on November 16.

[14] The case proceeded to a bench trial, but not without substantial delay. Abed removed the case to federal court in the Northern District of Indiana three times in 2022. Each time the district court remanded the case to state court because removal was untimely.[6] In late 2022, Abed moved for a stay pending the resolution of a potential criminal case, which the trial court also denied. In January 2023, one day prior to a scheduled trial date, Abed filed for Chapter 13 bankruptcy in Minnesota, resulting in an automatic stay. In March, again the day before a scheduled trial date, Abed filed for Chapter 7 bankruptcy in Illinois, causing the trial court to cancel the trial. Throughout 2022 and 2023, Abed filed numerous motions to stay for various medical reasons including an ankle injury.

[15] The trial court held a bench trial over two days on April 21 and 28, 2023. On the first day, Abed was not present but appeared by recently retained counsel.

---

[6] The third time Abed removed the case to federal court was the Friday before a Monday trial date. The trial court proceeded to hold a bench trial, which it later vacated for jurisdictional reasons related to the timing of the removal and remand order.

At the outset, Abed's counsel moved for a continuance because his client and witnesses were unable to attend. After summarizing the various delays, the trial court denied the motion, stating: "Unfortunately, it's time for this one to go." *Tr. Vol. 2* at 4. Later that morning, the trial court recessed to accommodate Abed's counsel's hearings in other courts. The trial court also allowed Abed to cross-examine a witness beyond the scope of direct testimony for efficiency, stating, "And the truth is, do I want him to call [the witness] back later this afternoon? Let's get [the witness] done so he can go." *Id.* at 31. When it became apparent the trial could not be concluded in one day as planned, the trial court continued the trial until the next Friday.

[16] On day two, the trial court began the day stating, "Lawyers, we gotta have it done today. I mean, I don't have another day for you. We gotta squeeze it in. You asked for a day. I'm giving you a day plus. We need to get this completed today." *Id.* at 174. Throughout the day, the trial court stressed time was of the essence. For example, the trial court admonished Abed's counsel after a long pause in questioning, "I need you to ask some questions. We really only have three hours, counsel. We really do." *Id.* at 184. At a midmorning break, the trial court informed counsel for both parties:

> We're going to take a break. And the two of you need to make alternate plans for your weekend because we're staying here, I'm going to say, until midnight tonight. We're going to pick up at 8:30 tomorrow. We're going to cook all day tomorrow, if we have to, and we're going to cook all day Sunday.

*Id.* at 198.  Later, after ElSharif called Abed to testify, Abed's counsel declined the opportunity to cross-examine Abed.  He informed the trial court he instead intended to re-call Abed later in his case-in-chief.  Although ElSharif protested Abed's approach would be less efficient, the trial court stated: "You know what?  I'm going to let him.  . . . He can try his case the way he wants to try it." *Id.* at 222.  But the trial court reiterated, "We're going to stay to midnight.  . . . We're going to finish this trial." *Id.*

[17]   During the day, several witnesses were late.  By the parties' agreement and in the interest of efficiency, Abed's testimony was interrupted twice so the trial court could hear testimony as witnesses became available.  The court recessed for two and one-half hours in the afternoon while Abed's counsel attended a hearing in another court.  The trial resumed, and when testimony continued into the early evening, the trial court admitted, "I'm starting to get tired.  And so, when I get tired, I get cranky.  And it's, you know, it's past 5:30 on a Friday." *Tr. Vol. 3* at 154.  At the close of trial, the trial court apologized to both parties, saying, "And if I was snarky this afternoon, I apologize.  I got tired and I got snarky.  I think I was—I'm not proud of this, but I think I was equally snarky both ways and I apologize.  . . . Thank you all." *Id.* at 172–73. The trial concluded at 6:13 p.m.

[18]   On June 2, 2023, the trial court issued its ruling.  The trial court declared all transfer documents *void ab initio* as the product of fraud, thus quieting title to the Killarney residence for the estate and the Summer Street property for Samirah Realty, LLC.  The trial court further found Abed's forgery deprived ElSharif of

the value of the Killarney residence, or $950,000. Thus, ElSharif was entitled to three times the value of the property under the CVRA, or $2.85 million.[7] The trial court also awarded the estate attorney fees of $253,209.21, for a final judgment of just over $3.1 million. Abed now appeals.

## 1. The suit sounds in equity and therefore Abed had no right to a jury trial.

[19] Abed argues the trial court violated his state constitutional right to a jury trial. Whether certain claims are entitled to a trial by jury presents a pure question of law; therefore, we review the issue *de novo*. *Lucas v. U.S. Bank, N.A.*, 953 N.E.2d 457, 460 (Ind. 2011).

[20] Article 1, Section 20 of the Indiana Constitution states: "In all civil cases, the right of trial by jury shall remain inviolate." This constitutional provision preserves the right to a jury trial only "'as it existed at common law' at the time Indiana adopted its current constitution." *State v. $2,435 in U.S. Currency*, 220 N.E.3d 542, 545 (Ind. 2023) (quoting *Songer v. Civitas Bank*, 771 N.E.2d 61, 63 (Ind. 2002)) (emphasis omitted). By contrast, for equitable cases or claims, it is well-settled that a party is not entitled to a jury trial. *Id.*

[21] To give effect to these principles, Indiana Trial Rule 38(A) provides:

---

[7] The trial court found ElSharif failed to demonstrate loss of value from the Summer Street property since it continued to operate and earn income as a gentleman's club. No evidence was presented as to the value of the Seif, LLC membership interest and Additional Assets, so the trial court awarded no damages related to those.

> **Causes triable by court and by jury.** Issues of law and issues of fact in causes that prior to the eighteenth day of June, 1852, were of exclusive equitable jurisdiction shall be tried by the court; issues of fact in all other causes shall be triable as the same are now triable. In case of the joinder of causes of action or defenses which, prior to said date, were of exclusive equitable jurisdiction with causes of action or defenses which, prior to said date, were designated as actions at law and triable by jury—the former shall be triable by the court, and the latter by a jury, unless waived; the trial of both may be at the same time or at different times, as the court may direct.

Thus, to determine whether the right to a jury trial under Article 1, Section 20 applies,

> we first ask whether the cause of action existed in 1851. If so, then history settles the matter. But if the cause of action did not exist in 1851, we must decide whether the claim is analogous to one at law or one in equity, as those terms were then understood.

*$2,435 in U.S. Currency*, 220 N.E.3d at 545 (citations and footnote omitted).

[22] Further, in interpreting Trial Rule 38(A), our Supreme Court has stated, "[i]f the essential features of a suit as a whole are equitable and the individual causes of action are not distinct or severable, the entitlement to a jury trial is extinguished." *Songer*, 771 N.E.2d at 68. On the other hand, if a single cause of action in a multi-count complaint is plainly equitable, and the other causes of action purely legal and sufficiently distinct and severable, Trial Rule 38(A) requires a jury trial on the legal claims. *Id*. In suits that contain both legal and equitable causes of action or defenses:

> The appropriate question is whether the essential features of the suit are equitable. To determine if equity takes jurisdiction of the essential features of a suit, we evaluate the nature of the underlying substantive claim and look beyond both the label a party affixes to the action and the subsidiary issues that may arise within such claims. Courts must look to the substance and central character of the complaint, the rights and interests involved, and the relief demanded. In the appropriate case, the issues arising out of discovery may also be important.

*Id*. However, the *Songer* test is not "the endpoint of the inquiry." *Lucas*, 953 N.E.2d 457, 465. As our Supreme Court has explained, the factors enunciated in *Songer* "rather serve to help answer the overarching question of whether the legal claims are related enough to the [equitable] action to be drawn into equity or are sufficiently distinct and severable to require a jury trial." *Id*. Therefore, if a lawsuit contains both equitable and legal causes of action or defenses,

> the trial court must decide whether core questions presented in any of the joined legal claims significantly overlap with the subject matter that invokes the equitable jurisdiction of the court. If so, equity subsumes those particular legal claims to obtain more final and effectual relief for the parties despite the presence of peripheral questions of a legal nature.

*Id*. at 465–66. *Lucas* preserves the "equitable clean-up doctrine," which "under certain circumstances, involves drawing legal claims into equity, thus extinguishing the right to a jury trial on those legal claims." *Id.* at 460.

[23] In Counts 1 and 2, ElSharif seeks to quiet title to the Indiana Real Estate and asks the trial court to declare void the recorded quitclaim deeds. In Count 3,

ElSharif requests a declaratory judgment that (1) the assignment of Seif's interest in Seif, LLC to Abed is a forgery and thus void, and (2) the estate is the rightful owner. In Count 7, ElSharif seeks declaratory judgment that (1) all other documents purporting to transfer Seif's assets are forgeries and void, (2) Abed has no right, title, or interest in Seif's assets, and (3) the estate is the rightful owner. ElSharif also demands injunctive relief preventing Abed or any of his associates from claiming any interest in Seif's assets. Finally, in Counts 4 through 6, ElSharif alleges Abed committed the crime of forgery and seeks damages, attorney fees, and expenses under the CVRA. In Abed's two amended counterclaims, he seeks (1) damages from the sale of the Shannon Bridge lot, and (2) declaratory judgment he is the owner of all Seif's assets.

[24] ElSharif captions two causes of action "quiet title." But the essence of the suit is for judicial declaration the quitclaim deeds and other transfer documents should be set aside as forgeries. In *Monnett v. Turpie*, plaintiffs alleged defendants fraudulently and without consideration induced plaintiffs' late father to execute warranty deeds conveying his real estate to defendants prior to his death. 32 N.E. 328, 328 (Ind. 1892). Plaintiffs sued seeking cancellation of the instruments, and the trial court refused defendants' request for a jury trial. *Id*. On appeal, our Supreme Court explained if the action was to quiet title, the action was triable to a jury; but if, "on the contrary, the action was for the cancellation of the deeds, it was one that, prior to the 18th day of June, 1852, would have fallen within the exclusive jurisdiction of a court of equity, and was

triable by the court." *Id*. at 329.[8] The *Monnett* Court concluded the complaint was for equitable, rather than legal, relief, in part because the primary object of the action was cancellation of the conveyances. *Id*.

[25] In *McClamroch v. McClamroch*, plaintiffs sought to rescind a deed allegedly procured by undue influence. 476 N.E.2d 514, 520 (Ind. Ct. App. 1985), *trans. denied*. On appeal, this Court held "a suit to set aside a deed is submitted to the equitable jurisdiction of the trial court" and thus there was "no constitutional right to a jury trial." *Id.* at 519. And in *Terpstra v. Farmers & Merchants Bank*, the trial court entered a declaratory judgment voiding numerous recorded instruments purporting to be common law liens. 483 N.E.2d 749, 759 (Ind. Ct. App. 1985), *trans. denied*. This Court on appeal held the "claim for relief, that [recorded] liens be declared void and that they be removed from the record, is quite clearly an equitable one[.]" *Id*. Accordingly, a suit to set aside deeds and other instruments related to real property is equitable in nature and there is no right to a trial by jury.

---

[8] In a recent case, our Supreme Court provided historical context helping to explain the distinction between legal and equitable actions where property ownership is in dispute:

> Before abolition of the distinction between actions at law and suits in equity, the common-law courts traditionally decided disputes over the ownership of property simply by determining which party held "good title at law." 1 Dan B. Dobbs, Law of Remedies § 4.3(1), at 586 (2d ed. 1993). This limited the relief available to a plaintiff who, for example, had been unjustly induced to give away title. In the face of such injustices, the courts of equity sidestepped legal formalities by acting "upon the person of the defendant" rather than deciding the question of title. *Id*. § 4.3(1), at 587. While the law "declared rights in things," equity "commanded the defendant's conscience to act" by ordering them, for example, to reconvey the property they had inequitably acquired. *Id*. § 2.2, at 74.

*$2,435 in U.S. Currency*, 220 N.E.3d at 558.

[26] Early decisions of our Supreme Court have similarly held suits to rescind contracts for fraud sound in equity. In *Songer*, our Supreme Court neatly summarized the holding of *Hendricks v. Frank*, 86 Ind. 278 (1882):

> In *Hendricks v. Frank*, a debtor conveyed his only unencumbered property to avoid payment to his creditors, and the creditors filed suit to rescind the conveyance. The case was tried before a jury, to which a creditor objected. This Court concluded that a jury trial was improper, endorsing the opinion of Supreme Court Commissioner John Morris, who wrote, "Upon the general subject of fraud courts of equity have concurrent jurisdiction with courts of law; but in a cause or suit to rescind a contract for fraud, [courts of equity] had, in June, 1852, exclusive jurisdiction."

*Songer*, 771 N.E.2d at 64 (citations and footnote omitted); *see also Fish v. Prudential Ins. Co. of Am.*, 75 N.E.2d 57, 59 (Ind. 1947) ("An action to rescind and cancel a written instrument is one in equity."); *Towns v. Smith*, 16 N.E. 811, 812 (Ind. 1888) (holding a "proceeding in the nature of a creditors' bill to set aside and cancel a fraudulent conveyance . . . belongs exclusively to the procedure and jurisdiction of chancery").

[27] In Counts 1, 2, 3, and 7, ElSharif seeks to have the quitclaim deeds and other written instruments transferring Seif's assets to Abed declared void and set aside due to forgery. A close review of the complaint's substance and character, the rights and interests involved, and the relief requested, demonstrates the essential features of ElSharif's suit are equitable. *Songer*, 771 N.E.2d at 68. Accordingly, there is no right to a jury trial on ElSharif's claims in Counts 1, 2, 3, and 7.

[28] As to ElSharif's claims for damages under the CVRA (Counts 4 through 6), and Abed's counterclaim for damages arising from the Shannon Bridge lot sale, claims for money damages were exclusively legal actions in 1852. *See Gates v. City of Indianapolis*, 991 N.E.2d 592, 595 (Ind. Ct. App. 2013), *trans. denied*. Moreover, the CVRA creates a civil remedy, but because it relies on proof of a predicate criminal offense, it is "inherently quasi-criminal." *Wysocki v. Johnson*, 18 N.E.3d 600, 605 (Ind. 2014); *see also Browning v. Walters*, 616 N.E.2d 1040, 1045 (Ind. Ct. App. 1993) (observing "[w]hile the statute contains both remedial and punitive elements, we have characterized [a prior version of the CVRA] as largely a penal measure"). Neither criminal nor quasi-criminal actions were historically equitable in nature, and thus normally a jury trial is required. *Cunningham v. State*, 835 N.E.2d 1075, 1079 (Ind. Ct. App. 2005), *trans. denied*.

[29] However, ElSharif's claims for damages under the CVRA and Abed's counterclaims are not sufficiently distinct from the equitable issues to be severable. In *Lucas*, a bank brought an equitable action to foreclose on mortgaged property. 953 N.E.2d at 461. The property owner raised a host of legal defenses and counterclaims, including several requests for treble damages under the CVRA. *Id.* at 461–62. Our Supreme Court compared the core issues presented by the legal defenses and counterclaims to those presented by the equitable foreclosure action. *Id.* at 466. The Court held the legal defenses and counterclaims were so "intertwined" when viewing the suit "*as a whole*" to invoke the equitable jurisdiction of the trial court and extinguish the right to a

jury trial. *Id.* Here, the core issue presented by the equitable claims is whether Abed forged the quitclaim deeds and other transfer documents. ElSharif's legal claims under the CVRA and Abed's counterclaims depend entirely on resolution of the same issue. In other words, the joined legal claims here "significantly overlap with the subject matter that invokes the equitable jurisdiction of the court." *Id.* at 465. As in *Lucas*, the equitable claims in this case subsume the legal claims "to obtain more final and effectual relief for the parties despite the presence of peripheral questions of a legal nature." *Id.* at 466.

[30] Because essential features of ElSharif's suit to set aside fraudulent deeds and instruments are equitable, and the legal claims asserted in the complaint and answer are not severable from the equitable subject matter, the suit was triable to the bench. Abed had no right to a jury trial under Article 1, Section 20 and Trial Rule 38(A).[9]

## 2. The trial court did not abuse its discretion in denying Abed's motion to recuse.

[31] Abed argues the trial court abused its discretion in denying his motion for the judge to recuse. We review a judge's decision about whether to recuse for an abuse of discretion. *L.G. v. S.L.*, 88 N.E.3d 1069, 1071 (Ind. 2018). "An abuse

---

[9] Because we conclude Abed had no right to a jury trial, we do not address the parties' arguments concerning whether granting the motion to strike and holding a bench trial constituted harmless error.

of discretion occurs when the judge's decision is against the logic and effect of the facts and circumstances before it." *Id*.

[32] The law presumes a judge is unbiased and unprejudiced. *Id*. To overcome this presumption, the moving party must establish the judge has personal prejudice for or against a party. *Id*. "Such bias or prejudice exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before [the court]." *Id*.

[33] Abed first contends the trial court's use of the word "confederates" in its preliminary injunction order reveals the "the trial court's predisposition of the entire case one year prior to the trial[.]" *Appellant's Br.* at 17. Abed cites dictionary definitions of "confederate" and "confederacy" showing the words carry connotations of illegality or secrecy. He seems to argue the trial court expressed an opinion on the merits of the controversy by using the term.

[34] However, by barring Abed and his associates from the Indiana Real Estate, the preliminary injunction order merely kept possession with the party that had exercised control over it for the past two years: the estate. The trial court further enjoined both parties from listing the property for sale or lease unless they jointly agreed, in which case any proceeds should be placed in trust and dispersed only under the trial court's order. Rather than expressing an opinion on the merits, the trial court's order maintained the *status quo* until the respective property rights of the parties could be adjudicated. Accordingly,

Abed has not shown personal prejudice arising from the use of the word "confederates."

[35] Abed next argues the trial court showed bias and prejudice by issuing a "cavalier denial" of Abed's motion to stay this case during potential criminal proceedings in another court. *Appellant's Br.* at 20.[10] Abed also contends the sum of the trial court's rulings that were adverse to Abed would cause "an objective person, knowledgeable of all the circumstances, [to] have a rational basis for doubting the judge's impartiality[.]" *Id.* at 21.

[36] We disagree. "Adverse rulings and findings by a trial judge are not sufficient reason to believe the judge has a personal bias or prejudice." *L.G.*, 88 N.E.3d at 1073. During the nearly two years this case was pending before trial, the trial court entered rulings in favor of both parties. Notably, as ElSharif points out on appeal, "the trial court denied the ElSharifs' motion for partial summary judgment, requiring them to take their claims to trial." *Appellee's Br.* at 25. The trial court granted many of Abed's motions for continuances. And the trial court often held a hearing to consider the merits before ruling on the parties' motions. Overall, nothing in the trial court's decisions on the pre-trial motions indicates a pattern of adverse rulings showing bias or prejudice toward Abed.

---

[10] Abed sets forth the factors a trial court should consider when deciding whether to stay a civil case because a related criminal matter is pending or imminent. However, Abed's claim on appeal is not that the trial court's ruling on the motion to stay was erroneous. Rather, he argues the trial court's adverse ruling on that motion is evidence of the trial judge's bias and prejudice.

[37]    Finally, Abed points to the trial court's demeanor during day two of trial, arguing it is evidence of bias or prejudice toward him. Trial judges have a responsibility to direct trials in a manner that facilitates ascertaining the truth, ensures fairness, and obtains economy of time and effort commensurate with the parties' rights. *Wright v. Miller*, 989 N.E.2d 324, 327 (Ind. 2013). "Trial courts enjoy wide discretion in the management and conduct of trial proceedings." *State v. Van Cleave*, 681 N.E.2d 181, 182 (Ind. 1997); *see also Terpstra*, 483 N.E.2d at 761 ("A trial judge has control over the proceedings in his [or her] court, and his [or her] duty is to conduct business expeditiously consistent with orderly procedure and the administration of justice.").

[38]    From the beginning of day two, the trial court's concern over managing the trial within the time constraints of its docket was paramount. The trial court directed both parties to keep up the pace. Abed now complains the trial court interrupted his testimony twice to accommodate late-arriving witnesses. But he did not object to the court's time management practices during trial. At one point, the trial court allowed Abed's attorney to cross-examine ElSharif's witness outside the scope of direct testimony for expediency. The trial court also accommodated Abed's counsel's schedule during trial. And even though it was not as efficient, the trial court ultimately allowed Abed to present his case in the order and manner he desired. At the close of trial, the trial court admitted to being "cranky" and "snarky" at times, but apologized to both parties before instructing them on how and when the court would rule. Based

on our review of the record, the trial court's demeanor and time management strategies during trial did not show a personal prejudice for or against Abed.

[39] Because Abed did not establish the trial court had personal bias or prejudice against him, we find no abuse of discretion in the trial court's denial of Abed's motion to recuse.

## Conclusion

[40] Because the essential features of the suit were equitable, and any legal claims so significantly overlapped with the equitable features of the suit to be subsumed by the equitable claims, Abed did not have a right to a jury trial. Further, the trial court did not abuse its discretion in denying Abed's motion to recuse.

[41] Affirmed.

Altice, C.J., and Weissmann, J., concur.

ATTORNEY FOR APPELLANT

D. Eric Neff
Crown Point, Indiana

ATTORNEYS FOR APPELLEES

Nancy J. Townsend
J. Brian Hittinger
Krieg DeVault LLP
Merrillville, Indiana

Alexandra Wilson Pantos
Krieg DeVault LLP
Indianapolis, Indiana